Dissent by Judge NOONAN
OPINION
FISHER, Circuit Judge:
Michael Demirdjian appeals the denial of his 28 U.S.C. § 2254 habeas petition. In 2001, he was convicted of murdering two teenage boys with intent to inflict torture; he was 15 years old at the time of the crimes. During closing argument, the prosecution repeatedly commented on the defense’s failure to explain key incriminating evidence or use competent evidence to support its exculpatory theories. Instead of objecting, defense counsel rebutted the comments by giving non-incriminating explanations of the evidence and reminding the jury the prosecution bore the burden of proof. Demirdjian was later sentenced to two consecutive terms of 25 years to life.
In his habeas petition, Demirdjian claims his counsel was ineffective by failing to challenge the prosecution’s statements as either improper comments on Demirdji-an’s decision not to testify, in violation of Griffin v. California, 380 U.S. 609, 615, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), or improper shifting of the burden of proof to the defense. He also claims his sentence violates the Eighth Amendment because it is the “functional equivalent” of a mandatory life-without-parole sentence, and he *1064 was a juvenile offender. The district court denied habeas relief on both claims.
We affirm under the deferential standard required by the Antiterrorism and Effective ' Death Penalty Act of 1996 (AEDPA). Under AEDPA, the question is not whether we think Demirdjian received ineffective assistance or an unconstitutional sentence, but whether there is any .reasonable argument to the contrary. We conclude there is. First, there is a reasonable argument that, because there was no actual prosecutorial error, defense counsel’s decision to rebut the prosecution’s comments directly rather than object at trial or on appeal was adequate', and this strategy did not undermine the reliability of Demirdjian’s conviction. Second, there is a reasonable argument Demirdjian’s sentence is constitutional because it actually allows for the possibility of parole.
I. Background
On the evening of Saturday, July 22, 2000, petitioner Michael Demirdjian, then 15, played basketball at a local park with 13-year-old Chris McCulloch and 14-year-old Blaine Taimo, Jr. Around 9:50 p.m., he left with the boys to go to a nearby school. The next evening, McCulloch and' Taimo were found on a playground a few blocks away — dead from multiple blunt force trauma. Next to Talmo’s battered head, officers found a 16-pound rock stained with both victims’ blood. A 12-foot bench weighing more than 60 pounds lay across McCulloch’s chest and neck. The right front pocket of Talmo’s pants was pulled out, as if emptied. A trail of bloody shoe prints indicated someone had walked away from the scene to an outside sink stained with McCulloch’s blood.
Police later found traces of McCulloch’s blood on Demirdjian’s doorjamb. In De-mirdjian’s trash were Talmo’s alarm clock and wallet — with some of the contents burned — and a pair of recently cleaned, but still bloody, sneakers. The discarded sneakers matched the bloody shoe prints, two dogs identified Demirdjian’s scent on the 16-pound rock, and drops of Demirdji-an’s blood were found at the crime scene. Demirdjian had fresh cuts on his hands and knuckles and had lied when asked by Talmo’s stepmother if he had seen Taimo. The state charged Demirdjian with two counts each of robbery and murder, with special circumstances for multiple murders, murder during a robbery and murder involving torture.
Demirdjian was tried twice. At his first trial, he took the stand and testified he had witnessed 19-year-old Adam Walker, a well-known drug dealer, murder the boys, but had not himself participated in the murders. That trial resulted in a hung jury, deadlocked at 8-4 in favor of conviction after a week of deliberations. At his second trial, Demirdjian did not testify. The prosecution focused on the key physical evidence tying Demirdjian to’the crime scene and implying a guilty mind. As to motive, the prosecution theorized Demird-jian and his friend Damian Kim had wanted to “jack” McCulloch and steal his money because, five days earlier, Walker had pulled a “jack move” and stolen hundreds of dollars from Demirdjian and Kim during a fake drug deal. The defense challenged the reliability of some of the prosecution’s key evidence, but focused primarily on introducing circumstantial evidence that Adam Walker murdered the boys and had his friends help clean up. Specifically, the defense emphasized that Walker had scrapes and bruises on his body, and police found at his friend’s home a washed rug, a blood stain initially matching the stain on Demirdjian’s door (but later found not to be a match) and' — in the trash — some damp clothes, gloves and a newspaper article about the crimes.
The first prosecutor to speak at closing, Barshop, noted the prosecution’s burden of *1065 proof, but repeatedly called on the defense to “explain” certain “unexplainable” evidence, such as the discarded wallet and clock, the bloody shoe prints and the blood stain at Demirdjian’s home. Defense counsel, Mathews, responded with non-incriminating explanations of the evidence and stressed that the prosecution bore the burden of proof. A second prosecutor, Do, spoke on rebuttal, discrediting the defense’s explanations and theory about Walker as not based on “reliable, competent evidence.” Defense counsel did not object to any of the prosecutors’ statements. The court later instructed the jury that Demirdjian had a constitutional right not to testify, the jury could not discuss or draw any inferences from his silence and the prosecution bore the burden of proof.
The jury deliberated for five days and convicted Demirdjian of two counts of first-degree murder, with special circumstances for multiple murders and intentional infliction of torture. He was acquitted of robbery and special-circumstance murder during a robbery and was sentenced to two consecutive terms of life imprisonment without parole. On appeal, Demirdjian’s counsel did not directly attack the prosecution’s closing argument challenges to the defense on key evidence, but did argue the jury had impermissibly considered Demirdjian’s silence.
After exhausting his direct appeals, De-mirdjian timely filed a state habeas petition claiming, among other things, ineffective assistance based on his counsel’s failure to challenge the prosecution’s closing statements as either violating Griffin or improperly shifting the burden of proof to the defense. The trial court summarily denied the petition, as did the California Court of Appeal, stating the petition “ha[d] been read and considered.” The California Supreme Court denied review.
While that petition was pending, the California Attorney General informed the trial court that Demirdjian’s sentence likely violated California law because he was only 15 years old at the time of the crimes. After a new sentencing hearing, Demirdji-an was resentenced to two consecutive terms of 25 years to life, making him eligible for parole after 50 years. On appeal, he argued his new sentence violated the Eighth Amendment because he was a juvenile offender. The California Court of Appeal affirmed, reasoning that no Supreme Court precedent barred his sentence, see People v. Demirdjian, 144 Cal.App.4th 10, 50 Cal.Rptr.3d 184, 187-88 (2006), and the California Supreme Court again denied review.
Demirdjian timely filed a federal habeas petition. After the district court dismissed the petition, we granted a certificate of appealability on two issues: whether De-mirdjian’s counsel was ineffective at trial and on appeal by failing to raise a claim of prosecutorial misconduct for Griffin error and improper burden shifting; and whether Demirdjian’s sentence of two consecutive terms of 25 years to life constitutes cruel and unusual punishment because he was a minor at the time of the crimes. We have jurisdiction under 28 U.S.C. §§ 1291 and 2253, and we affirm.
II. Standard of Review
We review de novo a district court’s denial of a habeas petition. See Murray v. Schriro, 745 F.3d 984, 996 (9th Cir. 2014). Our review is governed by AEDPA, which “bars relitigation of any claim ‘adjudicated on the merits’ in state court” unless the state court’s decision satisfies 28 U.S.C. § 2254(d)(1) or (2). Harrington v. Richter, 562 U.S. 86, 98, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011) (quoting 28 U.S.C. § 2254(d)). AEDPA’s relitigation bar applies to both Demirdjian’s summari *1066 ly denied ineffective assistance claim, see id. at 99-100, 131 S.Ct. 770, and his Eighth Amendment claim, see id. at 98, 131 S.Ct. 770. The California Court of Appeal’s decision on each claim is the “relevant state-court decision” for purposes of § 2254(d). Murray, 745 F.3d at 996. Accordingly, for each of Demirdjian’s claims, we cannot grant habeas relief unless the California Court of Appeal’s decision on that claim was “contrary to, or involved an unreasonable application of’ clearly established Supreme Court authority. 28 U.S.C. § 2254(d)(1).[1]
This standard is “difficult to meet.” Richter, 562 U.S. at 102, 131 S.Ct. 770. We must “determine what arguments or theories supported or” — for Demirdjian’s summarily denied ineffective assistance claim — “could have supported the state court’s decision” and “whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court.” Id. (emphasis added). We can grant habeas relief only where the state court’s decision is “so lacking in justification that there was an error ... beyond any possibility for fairminded disagreement.” Id. at 103, 131 S.Ct. 770.
It is “all the more difficult” to satisfy § 2254(d)(1) where, as here, the petitioner raises an ineffective assistance claim. Id. at 105, 131 S.Ct. 770. Even on de novo review, the standard for showing ineffective assistance is “highly deferential.” Strickland v. Washington, 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). When we evaluate an ineffective assistance claim under § 2254(d)(1), our review is “doubly deferential.” Knowles v. Mirzayance, 556 U.S. 111, 123, 129 S.Ct. 1411, 173 L.Ed.2d 251 (2009). If “there is any reasonable argument that counsel satisfied Strickland’s deferential standard,” we must deny habeas relief. Richter, 562 U.S. at 105, 131 S.Ct. 770.
III. Ineffective Assistance Claim
Strickland provides the clearly established law governing Demirdjian’s ineffective assistance claim. See Gentry v. Sinclair, 705 F.3d 884, 899 (9th Cir. 2013) (evaluating an ineffective assistance claim under AEDPA using Strickland’s two-pronged test). In Strickland, the Supreme Court made clear “[t]he benchmark for judging any claim of ineffectiveness must be whether counsel’s conduct so undermined the proper functioning of the adversarial- process that the trial cannot be relied on as having produced a just result.” 466 U.S. at 686, 104 S.Ct. 2052. The Court then established a two-pronged test for meeting that standard: an individual must show “counsel’s performance was deficient” and “the deficient performance prejudiced the defense.” Id. at 687, 104 S.Ct. 2052. “Surmounting Strickland’s high bar is never an easy task.” Padilla v. Kentucky, 559 U.S. 356, 371, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010). We hold there is a reasonable argument Demirdjian has failed to do so here.
A. Deficient Performance
We first consider whether the California Court of Appeal reasonably' could have concluded defense counsel’s performance was not deficient. Under Strickland’s first prong, an attorney’s representation is deficient if it “fell below an objective standard of reasonableness,” as seen “from counsel’s perspective at the time.” 466 U.S. at 688, 689, 104 S.Ct. 2052. Because “it is all too easy” for courts to second guess errors in hindsight, id. at 689, 104 S.Ct. 2052 Strickland mandates a “strong pre *1067 sumption” that counsel acted “for tactical reasons rather than through sheer neglect,” Yarborough v. Gentry, 540 U.S. 1, 8, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003) (per curiam). To overcome this strong presumption, Demirdjian must show counsel’s errors were “so serious that counsel was not functioning as the ‘counsel’ guaranteed the defendant by the Sixth Amendment.” Strickland, 466 U.S. at 687, 104 S.Ct. 2052.
Demirdjian contends his counsel performed deficiently at trial and on appeal by failing to challenge some of the statements the prosecution made at closing. Before we can assess that performance, though, we must determine “whether the prosecutor’s remarks constituted objectionable misconduct.” Zapata v. Vasquez, 788 F.3d 1106, 1112 (9th Cir. 2015). In making that determination, we are mindful that “an unreasonable application of federal law is different from an incorrect application of federal law.” Williams v. Taylor, 529 U.S. 362, 410, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). AEDPA thus prohibits us from treating a prosecutorial statement as error if “there is any reasonable argument” to the contrary. Richter, 562 U.S. at 105, 131 S.Ct. 770.[2] Because there is a reasonable argument none of the statements was error, we hold the California Court of Appeal reasonably could have concluded counsel’s performance was not deficient.
1. Alleged Griffin Errors
Demirdjian has not shown the prosecution committed Griffin error beyond any possibility for fairminded disagreement. Griffin prohibits “comment by the prosecution on the accused’s silence.” 380 U.S. at 615, 85 S.Ct. 1229. We have distinguished, however, between permissible “comments about the lack of explanation provided by the defense” and impermissible “comments about the lack of explanation furnished by the defendant.” United States v. Mayans, 17 F.3d 1174, 1185 (9th Cir. 1994). A prosecutor’s remark thus can “call attention to the defendant’s failure to present exculpatory evidence,” id. so long as it is not “of such a character that the jury- would naturally and necessarily take it to be a comment on the failure to' testify,” Lincoln v. Sunn, 807 F.2d 805, 809 (9th Cir. 1987).
The nearly two do¿en Griffin errors alleged here fall info three main groups. The first group, by far the largest, consists of statements' asking defense counsel Mathews to explain certain “unexplainable” evidence. These statements followed the same pattern. The first prosecutor, Barshop, highlighted a piece of incriminating evidence — the cuts on Demirdjian’s hands, the bloody shoe prints that matched the blood-stained sneakers in Demirdjian’s trash, the stain of McCulloch’s blood on Demirdjian’s doorjamb and the discarded wallet and clock — and offered the prosecution’s explanation. Barshop then expressly asked defense counsel — not Demirdjian — to “explain” the evidence in a npn-incriminating way.[3] Defense counsel Mathews respond *1068 ed on rebuttal by offering non-incriminating explanations of this evidence. The second prosecutor, Do, then criticized the defense’s explanations as not based on “reliable, competent evidence.”[4]
There is a reasonable argument none of these remarks violated Griffin. No statement directly “comment[ed] ... on [Demirdjian]’s silence.” Griffin, 380 U.S. at 615, 85 S.Ct. 1229. And we have upheld similar comments as merely calling attention to the defense’s failure to explain incriminating evidence or introduce exculpatory evidence. See, e.g., Mayans, 17 F.3d at 1179, 1186 (“[T]here is no evidence to contradict [the incriminatory nature of the defendant’s interaction].”); United States v. Sehnal, 930 F.2d 1420, 1423, 1425 (9th Cir. 1991) (“[A]sk [defense counsel] if he’s explaining to you why it is that none of these monies found their way into the corporate bank account.”); United States v. Wasserteil, 641 F.2d 704, 709 (9th Cir. 1981) (“I asked all the defendants ... to please explain to you how this legitimate business transaction worked.... Did you hear an explanation from them?”).
The dissent argues these statements were nevertheless Griffin error because Demirdjian was the “sole person who could provide information” on the prosecution’s questions. Rhoades v. Henry, 598 F.3d 495, 510 (9th Cir. 2010). As defense counsel’s rebuttal arguments demonstrated, however, Demirdjian was not necessarily the only source of explanation available to the defense.[5] Regardless, such comments are impermissible only where there are “very clear signals that the defendant himself, rather than the defense generally, was being discussed.” Mayans, 17 F.3d at 1185; see Sehnal, 930 F.2d at 1424 (prosecutor improperly used the rhetorical tag “ask him” to refer to the defendant); Lincoln, 807 F.2d at 809 & n.1 (prosecutor improperly said the defendant was the *1069 “only ... person who can tell us”); United States v. Sigal, 572 F.2d 1320, 1322-23 & n.1 (9th Cir. 1978) (prosecutor improperly said “the defendants did not deny” heading up part of the conspiracy). Here, the prosecutors’ focus on the defense’s failure to introduce “competent, admissible evidence” arguably was not a very clear signal that Demirdjian was being discussed. See, e.g., Rhoades, 598 F.3d at 511 (holding that the statement, “If there was evidence out there that would disassociate this gun from [the defendant], we’d have heard it,” was not Griffin error because a “natural reading” was “there was no meaningful challenge to the government’s evidence”).
The second group of statements came from Do’s rebuttal closing, where she commented on evidence indicating Demirdjian had a guilty mind. Do asked counsel to explain why the contents of Talmo’s wallet were burned and why Demirdjian had lied to Talmo’s stepmother about whether he had seen Taimo:
What Mr. Mathews has given is alternative facts....
How does he explain the fact that the contents [of Talmo’s wallet] are burned, and ripped-out, and thrown out with his bloody shoes? He hasn’t.... Has he given you any explanation for why Michael Demirdjian is destroying evidence? Any explanation for why Michael Demirdjian is concealing evidence?
Now, Mr. Matheivs wants you to believe that there’s no way Michael De-mirdjian would harm these two boys because they’re his friends. Just think about it.... [Demirdjian] looks at [Tal-mo’s stepmother] and he tells her, “I don’t know where they are. I haven’t seen them. I’m expecting a phone call.”
How do you explain that? He certainly was not Chris McCulloch and Blaine Talmo’s friends [sic].
(Emphasis added.) Although on de novo review this would be a eloselr case, there is at least a reasonable argument these statements merely commented on the defense’s “failure to present exculpatory evidence.” Mayans, 17 F.3d at 1185.
Again, none directly “commenced] ... on the accused’s silence.” Griffin, 380 U.S. at 615, 85 S.Ct. 1229. The first statement, which Do expressly addressed to defense counsel, arguably did not contain “very clear signals” she was referring to De-mirdjian in particular. Mayans, 17 F.3d at 1185. At one point, Do used the pronoun “he” to refer to both Mathews and De-mirdjian, but the referents are clear enough from context that the comment need not have “naturally and necessarily” called for an explanation from Demirdjian himself. Lincoln, 807 F.2d at 809 (emphasis added). For the other two statements, Do was not necessarily asking the jury to “treat the defendant’s silence as substantive evidence of guilt,” United States v. Robinson, 485 U.S. 25, 32, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988) (quoting Baxter v. Palmigiano, 425 U.S. 308, 319, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976)), but could have been permissibly using his earlier lies to discredit the theory that he was friends with the victims.[6]
In the final group of statements, Do directly addressed the defense’s theory that Adam Walker was the murderer. At trial, defense counsel had presented only circumstantial evidence to show Walker *1070 was the murderer. During closing, however, Mathews suggested one of Walker’s Mends, Greg Furnish, had seen Walker at the crime scene: “There was one witness to the murders,” Mathews told the jury, “and it was not Michael Demirdjian.”[7] Mathews also twice suggested Demirdjian “saw Adam Walker” at the crime scene — the second time over the prosecution’s objection. Though recognizing defense counsel’s remarks were “error,” the trial court ruled that, to avoid any Griffin error in response, the prosecution could not “comment” on what Demirdjian saw, but was “free to comment on” how the defense’s theory lay “outside any evidence that has been received in this trial.” On rebuttal, Prosecutor Do told the jury, “You’ve heard no testimony, no evidence from this witness stand, that puts Adam Walker at that crime scene.” And a few times she called the defense’s theory “smoke and mirrors” or “a bunch of smoke screens to hide Michael Demirdjian.”
Do’s first statement was troublesome, but arguably permissible in context. Consistent with the trial court’s ruling, Do ostensibly highlighted the problems with the defense’s circumstantial evidence before concluding there was “no testimony, no evidence” actually placing Walker at the crime scene. Because she never singled out Demirdjian as a possible witness — and there was another possible witness in Furnish — her remarks arguably constituted “legitimate comment ... on the weaknesses in the defense case.” Robinson, 485 U.S. at 32, 108 S.Ct. 864 (internal quotation marks omitted); see Mayans, 17 F.3d at 1179, 1186 (upholding statement that “there is no evidence to contradict [the prosecution’s theory]” given “there [wa]s nothing to single out the defendant from his case in general”). Do’s “smoke and mirrors” comments, too, arguably were “directed to ‘the strength of the defense on the merits’ ” and thus were not an impermissible “ad hominem attack on defense counsel.” United States v. Ruiz, 710 F.3d 1077, 1086 (9th Cir. 2013) (quoting United States v. Nobari, 574 F.3d 1065, 1079 (9th Cir. 2009)). As Do explained, she was highlighting “each and every area Mr. Mathews has raised that I believe are smoke and mirrors to trick you into believing there’s something there that really isn’t.” See United States v. Del Toro-Barboza, 673 F.3d 1136, 1150-51 (9th Cir. 2012) (noting that similar remarks in another case only “may have crossed the line”).[8]
The dissent assumes the prosecution’s remarks, taken together, necessarily commented on Demirdjian’s silence. Dissent at 1080-81. We agree the prosecution’s statements were aggressive, and some were close enough to crossing the line that, on de novo review, they would present a closer case. But “AEDPA demands more.” Richter, 562 U.S. at 102, 131 S.Ct. 770. No statement directly called attention to Demirdjian’s failure to testify; and each statement, whether in isolation or in conjunction with others, reasonably could be understood as calling attention to the defense’s failure to present exculpatory evidence. Because we cannot say any statement violated Griffin “beyond any *1071 possibility for fairminded disagreement,” id. at 103, 131 S.Ct. 770, the California Court of Appeal reasonably could have concluded there were no Griffin errors.
2. Alleged Burden Shifting
Demirdjian has not shown the prosecution clearly shifted the burden of proof to the defense. Barshop began his argument by emphasizing the jury must “decide the case based on the facts that you analyze,” and characterizing counsel’s presentation of the defense as “attacking]” Talmo’s stepmother, “infer[ring]” the facts were “compromised” because Talmo’s father was a deputy sheriff and claiming Demirdjian’s race was the “reason” for the first-degree murder charge. “In the bottom of the line,” he said:
[I]t is always easier to attack a case than to defend it. And it is clear that the People have the burden of proof, and that will be an instruction that you receive.
But attack the case with real evidence, with competent evidence, not meanness, not nastiness.
(Emphasis added.) Asserting that “the evidence supports a theory that clearly the defendant is a perpetrator,” Barshop then asked defense counsel, “What is the evidence that is offered other than ours?” with respect to Demirdjian’s cuts, and invited counsel to explain the blood on the doorjamb “[b]y competent, admissible evidence. ... Not by way of hypothesis, not by way of attorney spin, but by evidence admissible in a court of law.” Do echoed Barshop’s argument during rebuttal, saying, “The evidence is what comes off this witness stand, not what from the attorneys say or spin.” She also twice quoted Bar-shop’s refrain in rebutting counsel’s explanations of the blood stains and Demirdji-an’s cuts, each time arguing Mathews had not explained the evidence with “competent, reliable, admissible evidence.”
Demirdjian contends these statements impermissibly implied he had a duty or burden to produce evidencei But we rejected a similar burden-shifting claim under a plain-error standard in United States v. Vaandering, 50 F.3d 696 (9th Cir. 1995), where the prosecution repeatedly told the jury there was “no evidence” the defendant, who had been charged with distributing methamphetamine, had ever had a job aside from drug dealing. Id. at 701-02 (citing United States v. Mares, 940 F.2d 455, 461 (9th Cir. 1991)). We reasoned such “comment on [the defendant’s] failure to present exculpatory evidence” was permissible because it did not “expressly or implicitly shift[] the burden of proof,” and the prosecutor “expressly told the jury the burden of proof was on the government.” Id. at 702.
Here, too, Barshop told the jury the prosecution “clear[ly] ... ha[s] the burden of proof’; no statement expressly shifted that burden, and arguably none implicitly shifted that burden either. The jury reasonably could have inferred that — in context — each repetition of Barshop’s refrain was intended, like his original statement, merely as comment on the defense’s trial tactics and weaknesses m the defense’s theory of the case. Cf. United States v. Tucker, 641 F.3d 1110, 1122 (9th Cir. 2011) (“While the prosecutor’s phrasing was inartful, his meaning is evident from context: to believe the defendant’s account; the jury would have to believe implausible aspects of his testimony. This sort of argumentation is permissible.”). We agree with Demirdjian that it is problematic the prosecution referred to its burden only once. But we acknowledge, as we must under AEDPA, that a fairminded jurist nevertheless could conclude the repetition of “competent, reliable, admissible evidence” merely highlighted that the defense had challenged the prosecution’s case with in *1072 nuendo and accusation, not exculpatory evidence.
The dissent contends the prosecutors’ statements “impermissibly crossed the line” by arguing the defense had failed to counter the -prosecution’s theory. Dissent at 1080. That distinction made no difference in Vaandering, however, where we upheld the prosecution’s statement that “[t]here is no evidence ... [the defendant] ever had a job other than dealing drugs.” 50 F.3d at 701. Even the dissent’s sole authority on this point held that “brief comments ... noting the absence of evidence contradicting what was produced by the prosecution on several points.... did [not] impermissibly shift the burden of proof to defendant.” People v. Bradford, 15 Cal.4th 1229, 65 Cal.Rptr.2d 145, 939 P.2d 259, 322-23 (1997); see also People v. Woods, 146 Cal.App.4th 106, 53 Cal.Rptr.3d 7, 11 (2006) (“Comments on the ... defense’s failure to call logical witnesses, introduce material evidence, or rebut the People’s case are generally permissible.” (emphasis added)). The California Court of Appeal reasonably could have concluded there was no burden-shifting.
3.Alleged Appeals to the Jury’s Passions
The dissent asserts defense counsel performed deficiently by failing to object to the prosecution’s various “appeals to jurors’ emotions” during closing. Dissent at 1081-82. We do not reach these additional statements because they are not properly before us. Demirdjian mentions only the prosecution’s reference to “[t]errorism against the state”-and even then only as evidence of prejudice, not deficient performance. Demirdjian failed to raise the remaining statements before the California Supreme Court and the district court, and does not dispute that those statements are therefore forfeited, see Miles v. Ryan, 713 F.3d 477, 494 n.19 (9th Cir. 2013), and unexhausted, see 28 U.S.C. § 2254(b) (requiring habeas petitioners to exhaust their claims in state court); Gentry v. Sinclair, 705 F.3d 884, 901 (9th Cir. 2013) (“Exhaustion requires a statement of the ‘operative facts’ that support the federal legal theory giving rise to the claim.”).
4.. Counsel’s Performance at Trial and on Appeal
Defense counsel Mathews did not object to any of the statements we have been discussing, in assessing his performance, we begin with the “strong presumption” that he did not object “for tactical reasons.” Yarborough, 540 U.S. at 8, 124 S.Ct. 1. Although Demirdjian has not provided a declaration from Mathews to show his actual reasons for not objecting, the record suggests Mathews made a strategic decision not to object and instead to address the prosecution’s comments through his rebuttal. During rebuttal, counsel repeatedly said Barshop had “invited me” or “challenged me”-not the defendant-to explain • the evidence. He then gave an exculpatory explanation for each “unexplainable” fact, and stressed-three times-that the prosecution bore the burden of proof. To demonstrate the prosecution had failed to meet its burden, Mathews criticized the prosecution’s failure to offer a coherent motive, catalogued how the investigation had been “botched” and challenged the prosecution to “explain” evidence that he said “proves conclusively that Adam Walker did this crime.” And he reminded the jury that it would be instructed to disregard the prosecution’s “opening appeals to passion, prejudice, and sympathy.”
The California Court of Appeal thus reasonably could have presumed that counsel made a strategic decision to address the prosecution’s comments directly instead of objecting. We cannot say that such a strategic decision would have been objectively *1073 unreasonable beyond any possibility for fairminded disagreement. We have repeatedly held that, “absent egregious misstatements,” failing to object to error during closing argument falls within the “ ‘wide range’ ” of reasonable assistance. Cunningham v. Wong, 704 F.3d 1143, 1159 (9th Cir. 2013) (quoting United States v. Necoechea, 986 F.2d 1273, 1281 (9th Cir. 1993)); see also Zapata v. Vasquez, 788 F.3d 1106, 1116 (9th Cir. 2015) (holding that “patent, inflammatory and repeated misconduct” was “egregious”). Arguably none of the statements here was error — let alone egregious error. In these circumstances, the state court could have concluded Mathews reasonably thought any objection would be “meritless,” Juan H. v. Allen, 408 F.3d 1262, 1273 (9th Cir. 2005), or decided not to object “to avoid highlighting [the statements],” Cunningham, 704 F.3d at 1159. Because Mathews directly responded to the prosecution’s comments, and those comments arguably were not “patent, inflammatory and repeated,” the state court was not required to conclude he performed deficiently by failing to object. Zapata, 788 F.3d at 1116.
The dissent disagrees based on its assumption that the prosecution’s statements were, in fact, “egregious,” Dissent at 1081— 82, but the California Court of Appeal was not required to make that assumption. To be sure, Mathews could have developed a record for appeal or tried to curtail the prosecution’s repetition by objecting to some of the statements. Bijt he also “could have legitimately thought that an objection would have served only to draw further attention to the damaging statement while clearly not erasing its effect from the jurors’ minds.” United States v. Eaglin, 571 F.2d 1069, 1087 (9th Cir. 1977). Strickland simply does not allow us to “second-guess” Mathews’ decision with the benefit of hindsight. 466 U.S. at 689, 104 S.Ct. 2052. Under AEDPA, we must “afford ‘both the state court and the defense attorney the benefit of the doubt.’ ” Woods v. Etherton, — U.S. -, 136 S.Ct. 1149, 1151, 194 L.Ed.2d 333 (2016) (per curiam) (quoting Burt v. Titlow, — U.S. -, 134 S.Ct. 10, 13, 187 L.Ed.2d 348 (2013)).
As to the competence of Mathews on appeal, because a fail-minded jurist could conclude counsel was not deficient at trial, she “could certainly conclude that the [state] court was not objectively unreasonable in deciding that appellate counsel was not incompetent.” Id. at 1153; see Turner v. Calderon, 281 F.3d 851, 872 (9th Cir. 2002) (“A failure to raise untenable issues on appeal does not fall below the Strickland standard.”). Mathews focused the appeal on challenging what he argued was the “only link” allowing the jury to find Demirdjian had participated in the murders: the dog scent identifications. Counsel also raised five other claims of prosecutorial misconduct, including one for implying during closing argument that Demirdjian was a “terrorist against the government.” Although counsel did not separately challenge the prosecution’s statements on the “unexplainable” evidence, he addressed them indirectly through a jury misconduct claim alleging the jury impermissibly considered Demirdjian’s silence during its deliberations. There is a reasonable argument Mathews’ failure to raise additional claims in this context was not “so serious” an error that he “was not functioning as the ‘counsel’ guaranteed the defendant by the Sixth Amendment.” Strickland, 466 U.S. at 687, 104 S.Ct. 2052.
Defense counsel no doubt could have done more to address the prosecution’s aggressive line of argument, or made a better record by objecting to some of the statements. But, given that the prosecution’s argument did not unquestionably cross the line, Demirdjian’s; present claim entails precisely the kind of “second- *1074 guess[ing]” of counsel’s strategy that Strickland prohibits. 466 U.S. at 689, 104 S.Ct. 2052. We therefore hold the California Court of Appeal reasonably could have concluded defense counsel’s failure to object fell within Strickland’s, “wide range” of reasonable assistance. Id.
B. Prejudice
Even if Demirdjian’s counsel had performed deficiently, he would not be entitled to habeas relief if the California Court of Appeal reasonably could have concluded he failed to establish prejudice. Under Strickland’s second prong, an individual must show “a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.” 466 U.S. at 694, 104 S.Ct. 2052. A “reasonable probability” is one “sufficient to undermine confidence in the outcome.” Id. That requires a “substantial, not just conceivable” likelihood of a different result. Richter, 562 U.S. at 112, 131 S.Ct. 770 (citing Strickland, 466 U.S. at 693, 104 S.Ct. 2052). Demirdjian argues there was a substantial likelihood of a different result because the evidence against him was weak, two jurors were actually prejudiced and the prosecution stressed an inference of guilt from his silence.'We hold the California Court of Appeal reasonably could have concluded otherwise.
Demirdjian first argues the evidence against him was weak and thus indicative of prejudice. See Strickland, 466 U.S. at 696, 104 S.Ct. 2052 (“[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.”). Although we agree the evidence of motive was weak, that arguably could not have affected the verdict. The jury was instructed that the prosecution need not prove motive and that the jury could — but need not — consider a lack of motive as a “circumstance” that might “tend to show” Demirdjian was not guilty. Moreover, Talmo’s wallet and clock were in Demirdjian’s trash, as were the burnt contents of the wallet and a pair of recently cleaned, blood-stained sneakers. No evidence negated this probative evidence of a guilty mind. Defense counsel also acknowledged Demirdjian had been at the crime scene, and there was significant physical evidence that reliably tied him to the murders. Drops of his blood were next to the shoe prints leading away from the victims’ bodies; his sneakers matched the shoe prints; and two different dogs identified his scent on the 16-pound rock. Demirdjian does not contest the reliability of the drops of blood and shoe prints, and there is a reasonable argument his challenges to the scent identifications did not undermine that evidence either.[9]
Accordingly, a fairminded jurist could conclude the evidence convincingly established (a) Demirdjian was at the crime scene, (b) handled the 16-pound rock, then (c) walked away bleeding and (d) went to a sink before returning home, where he (e) cleaned then discarded his sneakers and (f) discarded and burned some of Talmo’s property. Although the defense offered *1075 non-incriminating explanations of some of this evidence, those explanations were arguably implausible.[10] It therefore would have been reasonable to conclude Demird-jian did not establish prejudice based on the evidence against him. See Richter, 562 U.S. at 112, 131 S.Ct. 770 (“[i]t was also reasonable to find Richter had not established prejudice given that he offered no evidence directly challenging other conclusions reached by the prosecution’s experts” that supported only the prosecution’s theory of the crime scene).
Demirdjian next argues there was actual prejudice because one juror told a reporter, “I thought we should have heard from Michael Demirdjian,” and another reportedly was “persuaded to change her vote from not guilty to guilty ... because of [Demirdjian’s] failure to testify.” But there is no evidence the jury ever discussed Demirdjian’s silence; on the contrary, the first juror explained the “big factors” that weighed most heavily in the jury’s decision were the shoe prints and Demirdjian’s blood at the crime scene — not his silence. There were arguably other indications that the jury did not struggle to determine his guilt. On the fourth day of deliberations, the jury asked the court if Demirdjian could be guilty of special-circumstance murder as an aider and abettor, or if he had to be the “actual perpetrator.” Mere hours after the court answered that he could be convicted as an aider and abettor, the jury convicted him. Based on the timing and substance of this colloquy, a fair-minded jurist could conclude the key question for the jury was not whether but how Demirdjian had participated in the murders.[11]
Regardless, there is a.reasonable argument the jury instructions mitigated any prejudice. The jury was informed of the prosecution’s burden four times — once by the prosecution, and three times by the defense. The court likewise‘instructed the jury the prosecution had “the burden of proving [Demirdjian] guilty'beyond a reasonable doubt,” and the juby was not to discuss or “draw any inference from the fact that [he] d[id] not testify.” Because “|j]urors are presumed to follow the court’s instructions,” it would have been “reasonable for the state coiirt to conclude that the prosecutor’s remarks ... were not prejudicial.” Cheney v. Washington, 614 F.3d 987, 997 (9th Cir. 2010); see Cunningham, 704 F.3d at 1159 (holding there was no prejudice where the “comments were a single paragraph of a twenty-page argument and the trial judge explained to the jury that closing arguments are not evidence”).
Demirdjian finally argues there was prejudice because the prosecution stressed an inference of guilt from his silence. But this rationale turns on whether any statement was itself error. As we have seen, it *1076 would have been reasonable to conclude that there were no errors and ■ that the prosecution never actually asked the jury to infer guilt from Demirdjian’s silence. See Beardslee v. Woodford, 358 F.3d 560, 587 (9th Cir. 2004) (holding that “clearly not extensive” Griffin errors were not prejudicial under an analogous standard where the prosecution implied, but did not stress, that the defendant’s silence meant a lack of remorse).
The “ultimate focus” of the Strickland inquiry is on whether “the result of the particular proceeding is unreliable because of a breakdown in the adversarial process.” 466 U.S. at 696, 104 S.Ct. 2052. Although aspects of Demirdjian’s trial give us pause, we cannot say all fairminded jurists would find the result unreliable. Given both the strength of the incriminating evidence and the jury instructions, we hold the California Court of Appeal reasonably could have concluded there was no prejudice from counsel’s failure to object to the prosecution’s statements.
IV. Eighth Amendment Claim
Demirdjian contends his sentence of two consecutive terms of 25 years to life violates the Eighth Amendment because he was a juvenile at the time of his crimes. This claim relies solely on the retroactive application of Miller v. Alabama, — U.S. -, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012), which held “a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders” violates the Eighth Amendment. Id. at 2469. Demirdjian argues he is entitled to habeas relief because his sentence is the “functional equivalent” of the mandatory life-without-parole sentences overturned in Miller. We disagree. Although it is now established that Miller applies retroactively, see Montgomery v. Louisiana, — U.S. -, 136 S.Ct. 718, 736, 193 L.Ed.2d 599 (2016), Demirdjian still must show Milieu*s legal principles were “clearly established” at the time of the California Court of Appeal’s decision (six years before Miller) and this decision was “contrary to” Miller for purposes of § 2254(d)(1).[12] Demirdjian has not attempted to satisfy the first requirement; and we hold he has not satisfied the second.
Miller's prohibition of mandatory life-without-parole sentences for juvenile offenders rested in part on the premise that “a distinctive set of legal rules” applies to a life-without-parole term for juveniles. 132 S.Ct. at 2466. Because such a term is the “ultimate penalty for juveniles ... akin to the death penalty,” id. it “demand[s] individualized sentencing,” including consideration of the juvenile’s age and the circumstances of the crime, id. at 2467. Miller noted, however, that “no other sentences” “share [these] characteristics with death sentences.” Id. at 2466 (quoting Graham v. Florida, 560 U.S. 48, 69, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010)). There is a reasonable argument that Miller thus applies only to life-without-parole sentences.
Demirdjian concedes he has not received a life-without:parole sentence, but contends Miller nevertheless applies because his sentence is the “functional equivalent” *1077 of life without parole. The Supreme Court, however, has held an identical sentence was not controlled by federal precedent involving a life-without-parole sentence. See Lockyer v. Andrade, 538 U.S. 63, 73-74, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003). Lockyer reasoned a sentence of two consecutive terms of 25 years to life was “materially [ distinguishable” from a life-without-parole term because the petitioner actually “retained] the possibility of parole,” id. at 74, 123 S.Ct. 1166, albeit when he was 87 years old, see id. at 79, 123 S.Ct. 1166 (Souter, J., dissenting). So too here: because Demirdjian will be eligible for parole when he is 66 years old, his sentence arguably does not “share [any] characteristics with death sentences,” Miller, 132 S.Ct. at 2466 (quoting Graham, 560 U.S. at 69, 130 S.Ct. 2011), and thus does not necessarily trigger Millers requirements.[13]
Because fairminded jurists could disagree with Demirdjian that Millers, requirements applied to his sentence, we hold he is not entitled to habeas relief on his Eighth Amendment claim.
CONCLUSION
The judgment of the district court dismissing Demirdjian’s habeas petition is AFFIRMED.

. Demirdjian’s argument that § 2254(d) does not apply to his summarily denied ineffective assistance claim is precluded by Richter, 562 U.S. at 99-100, 131 S.Ct 770. Because he does not contend he is entitled to relief under § 2254(d)(2), we consider only § 2254(d)(1).

. The parties dispute which law governs that inquiry. Demirdjian assumes we should apply our own precedents on Griffin and burden shifting, whereas the state argues only clearly established Supreme Court authority is relevant, see Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) ("In cases where the Supreme Court has not adequately addressed a claim, this court cannot use its own precedent to find a state court ruling unreasonable.”). We do not decide the issue because Demirdjian would not prevail on this prong even under our own precedents. Assuming our case law on Griffin and burden shifting applies, we ask whether Demirdjian has proven prosecutorial error "beyond any possibility for fairminded disagreement.” Richter, 562 U.S. at 103, 131 S.Ct. 770.

. For example, after reasoning Demirdjian’s cuts must have come fronj handling the 16- *1068 pound rock found at the crime scene, Bar-shop said:
So I say to you, Mr. Mathews, explain it. What is the explanation for this other than mine? What is the evidence that is offered other than ours? Where did these injuries on the Defendant’s hands come from? ...
If you are in a fight or if you are delivering a blow, where are there injuries? To the knuckles.... Is there any other explanation? Is there any other valid, viable explanation? I think not. That's what the testimony is....
... How big do you have to be to pick up a big ass rock? 16-pound rock.... It’s where you cut your hands. How big do you have to be to hit somebody in the face? You cut your knuckle. You cannot explain the unexplainable. It’s not possible.
(Emphasis added.)

. Do said about Demirdjian’s cuts, for example:
[Demirdjian's] hands were cut and bruised. How does Mr. Mathews explain that?
Mr. Barshop asked, “explain it with competent, reliable, admissible evidence.” How does Mr. Mathews explain it? Well, Michael Demirdjian was playing basketball. You know how kids are. They get cuts.
... But you’re not getting cut and bleeding at a crime scene where there are two victims of a double homicide. That’s not a good explanation; not based on reliable, competent evidence.
(Emphasis added.)

. On rebuttal, Mathews countered the prosecution’s evidence in the absence of Demirdji-an’s testimony. As Mathews explained, the shoe prints merely confirmed what the jury already knew: that Demirdjian was at the crime scene. There was not “even one syllable of medical or scientific evidence” that De-mirdjian’s cuts came from handling a rock, he added, and they were too healed to have come from the time of the murders. Defense counsel further reasoned the blood stain on De-mirdjian’s doorjamb must have been planted by the police because McCulloch’s blood was not found anywhere else in Demirdjian’s home and the prosecution had previously "influence[d] the evidence.” And he argued the wallet and clock could not have been taken from Talmo’s body because there were no fingerprints or blood on them.

. Demirdjian points to Barshop's invitation to determine ‘'[wjhat's going on in Michael De-mirdjian’s mind,” given that his computer had material on "[k]illing somebody with a big ass rock.” There is a reasonable argument this invitation, too, did not comment on De-mirdjian’s silence, but merely pointed out that the jury needed to determine Demirdjian's mental state.

. Defense counsel never elicited this testimo-: ny from Furnish, who was a witness for the prosecution. On cross-examination, Furnish testified that Walker had been partying with him all night on the night of the murders, and that "Adam Walker had nothing to do with this murder.”

. Demirdjian further argues the prosecution’s remarks violated Griffin because two jurors later said they "should have heard from Michael Demirdjian.” But the jurors’ comments arguably indicated only that the jury might have interpreted the remarks in a way that would constitute Griffin error, not that it "naturally and necessarily” did so. Rhoades, 598 F.3d at 510.

. Demirdjian faults the first scent identification because, on her first attempt, the dog went past his home and lost the trail. But on that same attempt, the dog had reliably tracked the scent from the rock to Demirdji-an's own shoe prints, then to the sink and onto the road where Demirdjian lived. As the dog handler explained, the dog may have gone past Demirdjian’s home merely because she had picked up another trail he had left. Demirdjian "discredits]” the second identification because the second dog also identified the scents of two other individuals whom the defense asserted were in Palm' Springs at the time of the crimes. But the prosecution used cell phone records and an eyewitness identification to place both individuals at the crime scene. A fairminded jurist thus could conclude neither scent identification was unreliable.

. For example, defense counsel argued De-mirdjian’s shoe prints were at the scene because “[i]f you had seen what Michael De-mirdjian saw in your stupor, you'd get out of dodge too.” That explanation, however, arguably was inconsistent with the actual shoe prints, which indicated Demirdjian had walked away from the crime scene. Counsel now argues Demirdjian "checked to see if [Taimo] and [McCulloch] were alive.” But that argument, too, does not explain why he simply walked away after purportedly seeing his friends brutally murdered.

. We generally treat the "difficult time the jury had reaching a unanimous verdict” as an “indicator of prejudice,” Stankewitz v. Wong, 698 F.3d 1163, 1175 (9th Cir. 2012). We do not accord this factor great weight here, though, because there is a reasonable argument the jury’s conduct was "not an unambiguous sign it was a close case.” Walker v. Martel, 709 F.3d 925, 943 (9th Cir. 2013). Based on the timing of the questions and the quick turn-around after the response, the jury could have been exercising "diligence and care” in deciding Demirdjian’s role in the murders. Id.

. Teague v. Lane, 489 U.S. 288, 306-10, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), generally bars retroactive application of new constitutional rules of criminal procedure on collateral review. Teague’s retroactivity rule, however, is "quite separate from the relitigation bar imposed by AEDPA.” Greene v. Fisher, - U.S. -, 132 S.Ct. 38, 44, 181 L.Ed.2d 336 (2011). Even if applying a rule retroactively "would comport with Teague," we still must ask whether "doing so would contravene section 2254(d)(1)," Meras v. Sisto, 676 F.3d 1184, 1188 (9th Cir. 2012), by granting relief based on federal law not clearly established "as of the time the state court render[ed] its decision,” Greene, 132 S.Ct. at 44 (internal quotation marks omitted).

. As the state notes, a recently enacted California statute entitles Demirdjian to "a meaningful opportunity to obtain release[]” at a hearing "during the 25th year of [his] incarceration" — when he is 41 years old. Cal. Penal Code § 3051(b)(3), (e). Because this new authority would not change our holding, we neither rely on it nor decide whether 28 U.S.C. § 2254(d)(1) permits us to do so. Cf. Cullen v. Pinholster, 563 U.S. 170, 181, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011) (holding that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits”). Our holding, however, does not foreclose Demird-jian’s eligibility for a parole hearing after 25 years, or sooner, whether under California law or the California Supreme Court’s interpretation of federal law.