STATE of Missouri, Respondent,

v.

Ledale NATHAN, Appellant.

No. SC 95473

Supreme Court of Missouri,
en banc.

Opinion issued July 11, 2017

Nathan was represented by William J. Swift of the public defender's office in Columbia, (573) 777-9977.

The state was represented by Evan J. Buchheim of the attorney general's office in Jefferson City, (573) 751-3321.

Zel M. Fischer, Chief Justice

Ledale Nathan, convicted of crimes he committed as a juvenile, appeals the sentences imposed by the circuit court. Nathan argues the State committed a *Brady*[1] violation that warrants resentencing. He does not argue any punishment or sentence he received violates the constitution but argues the combined effect of his consecutive sentences, which include a homicide offense and several nonhomicide offenses, amount to the functional equivalent of life in prison without the possibility of parole and thereby violate the constitutional prohibition against cruel and unusual punishment, U.S. Const. amend. VIII; Mo. Const. art. I, § 21, and his constitutional right to due process, U.S. Const. amend. XIV, § 1; Mo. Const. art. I, § 10.[2] The dissenting opinion would hold a juvenile can never be sentenced to consecutive, lengthy sentences that exceed his life expectancy no matter how many violent crimes he commits. This suggestion ignores the undeniable truth that this Court's responsibility is *"discere lex, non dare lex*—to declare what the law is, not to make it or decide what it ought to be." *State ex rel. Maggard v. Pond*, 93 Mo. 606, 6 S.W. 469, 478 (Mo. 1887). This suggestion

1. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

2. Nathan does not argue, as some of the defendants did in the cases relied on by the dissenting opinion, that our state constitution provides *more* protection than the United States Constitution. "While provisions of our state constitution may be construed to provide more expansive protections than comparable federal constitutional provisions, analysis of a section of the federal constitution is strongly persuasive in construing the like section of our state constitution." *Doe v. Phillips*, 194 S.W.3d 833, 841 (Mo. banc 2006) (internal citations omitted). Sections 10 and 21 of the Missouri Constitution are nearly identical to the Due Process Clause of the Fourteenth Amendment and the Eighth Amendment's prohibition regarding cruel and unusual punishment, respectively. There is no reason to interpret article I, § 21 of the Missouri Constitution more expansively than the Supreme Court's holdings regarding the Eighth Amendment's prohibition against cruel and unusual punishment. *See State ex rel. Jackson v. Dolan*, 398 S.W.3d 472, 478 (Mo. banc 2013); *see also Burnett v. State*, 311 S.W.3d 810, 814 n.3 (Mo. App. 2009) ("Section 21 of the Missouri Constitution provides the same protection against cruel and unusual punishment. Mo. Const. art. I, § 21. We apply the same standard in determining whether a punishment violates the United States Constitution or Missouri Constitution.").

also ignores the fact that neither this Court's nor the Supreme Court of the United States' Eighth Amendment jurisprudence has ever addressed the cumulative effect based on constitutionally imposed consecutive sentences because it stands to reason a defendant subjects himself to multiple punishments when he has committed multiple offenses. The circuit court's judgment is affirmed.

### Factual and Procedural History

In connection with a home-invasion robbery and murder, the State charged Nathan, 16 years old at the time of the crimes, with 26 counts: 1 count of first-degree murder, 2 counts of first-degree assault, 4 counts of first-degree robbery, 1 count of first-degree burglary, 5 counts of kidnapping, and 13 related counts of armed criminal action.[3]

### Original Trial

After a jury found Nathan guilty in his original trial on all 26 counts, he waived jury sentencing. Pursuant to § 565.020.2,[4] the circuit court then sentenced Nathan to life in prison without the possibility of parole for the first-degree murder conviction. In addition, the circuit court sentenced him to five life sentences and five 15-year sentences for the nonhomicide convictions, all of which were to be served consecutively to each other and to the sentence for first-degree murder, and eleven life sentences for the armed criminal action convictions, all of which were to be served concurrently with the other sentences and to each other. The circuit court dismissed the remaining four counts on which the jury had found Nathan guilty, concluding it had no jurisdiction over those charges. The four counts dismissed included one count of first-degree robbery, one count of kidnapping, and two related counts of armed criminal action.

### Original Appeal

While Nathan's appeal was pending, the Supreme Court of the United States handed down its decision in *Miller v. Alabama*, 567 U.S. 460, 132 S.Ct. 2455, 2469, 183 L.Ed.2d 407 (2012), holding that "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." As this Court explained, *Miller* held "life without parole may not be imposed [for a juvenile offender] unless the sentencer is given an opportunity to consider the individual facts and circumstances that might make such a sentence unjust or disproportionate." *Nathan I*, 404 S.W.3d at 270 (footnote omitted).[5] This Court unanimously held the circuit court erred in dismissing the four counts for lack of jurisdiction and remanded for resentencing on those convictions as well as for resentencing on Nathan's first-degree murder conviction because the original sentence "was imposed with no individualized consideration of the myriad of factors discussed in *Miller*." *Id.* at 260, 270. A majority of this Court further held that Nathan would be

---

3. The full details of these horrific crimes are recited in this Court's opinion in *State v. Nathan (Nathan I)*, 404 S.W.3d 253, 257–58 (Mo. banc 2013).

4. All statutory citations are to RSMo. 2000 unless otherwise noted. The General Assembly has significantly modified the sentencing provisions contained in Chapter 565 in light of holdings by the Supreme Court concerning

the constitutional validity of certain sentences imposed on juvenile offenders.

5. The term "sentencer" refers to the entity (i.e., the judge or jury) with the responsibility under state law to determine a defendant's sentence. *See, e.g., State v. Hart*, 404 S.W.3d 232, 234 n.2 (Mo. banc 2013). Here, this Court uses the term "sentencer" to refer to the circuit court.

entitled to reassert his right to jury-recommended sentencing on remand for the sentences he appealed. *Id.* at 270 n.10.

## Retrial of Sentencing

On remand, Nathan invoked his right to jury sentencing on the sentences he originally appealed, and both the State and Nathan presented evidence for the jury to consider. Because the jury did not unanimously agree to impose life in prison without the possibility of parole solely for the first-degree murder conviction, the circuit court vacated the guilty verdict on that charge and entered a finding of guilt for second-degree murder, in accordance with the procedure outlined by this Court in *Nathan I. See id.* at 270–71. As directed by this Court, the circuit court also vacated the armed criminal action conviction in connection with first-degree murder and entered a finding of guilt on armed criminal action in connection with second-degree murder. *See id.* at 271 n.11. The jury then recommended a life sentence for the second-degree murder conviction, a 30-year sentence for the first-degree robbery conviction, a 15-year sentence for kidnapping, and three life sentences for the related armed criminal action convictions.

Following the jury's recommendations, Nathan filed a motion requesting resentencing by a jury on the 20 convictions that were not part of the remand, claiming resentencing was warranted by a *Brady* violation.[6] Specifically, Nathan alleged the State failed to disclose, prior to his original waiver of jury sentencing, a police report detailing an investigation into alleged sexual abuse committed against him. He also filed a motion for a new trial or, alternatively, resentencing in which he again made the same *Brady* claim and further

argued the consecutive sentences on the nonhomicide convictions were the equivalent of life in prison without the possibility of parole and thus unconstitutional. The circuit court rejected these arguments, imposed the jury-recommended sentences, and ordered that the sentences run consecutively to each other and the previously imposed sentences, except for the armed criminal action sentences, which were ordered to run concurrently with their respective related charge. Nathan appealed, and after opinion by the court of appeals, this Court transferred the case pursuant to article V, § 10 of the Missouri Constitution.

## *Brady* Claim

Nathan argues the circuit court erred in overruling his motion for a new sentencing hearing because the State failed to disclose a police report that documented his previously suffered sexual abuse. Such a failure to disclose the police report, Nathan argues, caused his waiver of jury sentencing at his original trial to be made unknowingly, unintelligently, and involuntarily.

The Supreme Court in *Brady* held "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. 1194. "*Brady*, however, only applies in situations where the defense discovers information after trial that had been known to the prosecution at trial." *State v. Holden*, 278 S.W.3d 674, 679 (Mo. banc 2009). "If the defendant had knowledge of the evidence at the time of trial,

---

6. Nathan's right to invoke jury sentencing on remand did not apply to these convictions because he did not challenge them in his

original appeal. *Nathan I*, 404 S.W.3d at 271 n.12.

the state cannot be faulted for non-disclosure." *Id.* at 679–80.

Here, *Brady* is inapplicable because Nathan disclosed the alleged sexual abuse to a caseworker pursuant to a "hotline" investigation before trial and that communication was later placed into the police report and other records from the Missouri Department of Social Services—Children's Division. Clearly then, Nathan had knowledge of the contents of the police report. *See id.* Therefore, the State did not commit a *Brady* violation, and the circuit court did not err in overruling Nathan's motion.

## *Graham* Claim

 Nathan argues the circuit court's imposition of consecutive sentences on the homicide conviction along with the several nonhomicide convictions are the functional equivalent of life without possibility of parole and, thereby, violate the constitutional prohibition against cruel and unusual punishment and his constitutional right to due process under *Graham v. Florida*, 560 U.S. 48, 82, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010). When a criminal defendant alleges his or her constitutional rights have been violated, this Court's review is *de novo*. *State v. Sisco*, 458 S.W.3d 304, 312–13 (Mo. banc 2015).

The Supreme Court in *Graham* held, "The Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homi-

cide." In the scenario where, like here, a juvenile offender is convicted of both homicide and nonhomicide offenses, the Supreme Court explained:

> Juvenile offenders who committed both homicide and nonhomicide crimes present a different situation for a sentencing judge than juvenile offenders who committed no homicide. It is difficult to say that a defendant who receives a life sentence on a nonhomicide offense but who was at the same time convicted of homicide is not in some sense being punished in part for the homicide when the judge makes the sentencing determination. **The instant case concerns only those juvenile offenders sentenced to life without parole solely for a nonhomicide offense.**

*Id.* at 63, 130 S.Ct. 2011 (emphasis added).[7] Consequently, what the Supreme Court did not have before it in *Graham*, as this Court currently does, is whether the Eighth Amendment is violated when a juvenile offender like Nathan is sentenced to consecutive, lengthy sentences for committing multiple nonhomicide offenses along with a homicide offense.

The Supreme Court has not yet decided the question of whether consecutive sentences are, for constitutional purposes, the functional equivalent of life in prison without the possibility of parole. This issue has appeared in state and federal courts across the country, with differing conclusions.[8]

7. The Supreme Court stressed it needed to draw a "clear line" in order to "prevent the possibility that life without parole sentences will be imposed on juvenile nonhomicide offenders who are not sufficiently culpable to merit that punishment." *Graham*, 560 U.S. at 74, 130 S.Ct. 2011.

8. *Compare, e.g., Demirdjian v. Gipson*, 832 F.3d 1060, 1076–77 (9th Cir. 2016); *United States v. Walton*, 537 Fed.Appx. 430, 433–37 (5th Cir. 2013) (per curiam); *Bunch v. Smith*, 685 F.3d 546, 547–51 (6th Cir. 2012); *State v.*

*Kasic*, 228 Ariz. 228, 265 P.3d 410, 415–16 (App. 2011); *Lucero v. People*, 394 P.3d 1128 (Colo. 2017); *Adams v. State*, 288 Ga. 695, 707 S.E.2d 359, 365 (2011); *State v. Brown*, 118 So.3d 332, 335, 341 (La. 2013); *State v. Ali*, 895 N.W.2d 237 (Minn. 2017); *Vasquez v. Commonwealth*, 291 Va. 232, 781 S.E.2d 920, 926–28 (2016), *with Moore v. Biter*, 725 F.3d 1184, 1191–94 (9th Cir. 2013); *People v. Caballero*, 55 Cal.4th 262, 145 Cal.Rptr.3d 286, 282 P.3d 291, 295 (2012); *Casiano v. Comm'r of Corr.*, 317 Conn. 52, 115 A.3d 1031, 1043–

With no authoritative precedent from the Supreme Court, this Court finds the analysis of *Bunch v. Smith*, 685 F.3d 546 (6th Cir. 2012), most persuasive. There, the state trial court sentenced Bunch, a juvenile offender, to consecutive sentences totaling 89 years' imprisonment for committing multiple nonhomicide offenses. *Bunch*, 685 F.3d at 547. Bunch contested his sentences, arguing they were the functional equivalent of life in prison without the possibility of parole. *Id.* The Sixth Circuit rejected Bunch's constitutional challenge. *Id.* It explained "*Graham* ... does not clearly establish that consecutive, fixed term sentences for juveniles who have committed multiple nonhomicide offenses are unconstitutional when they amount to the practical equivalent of life without parole." *Id.* It further explained:

> [*Graham*] is not clearly applicable to Bunch's case. It is true that Bunch and Graham were both juvenile offenders who did not commit homicide. But while Graham was sentenced to life in prison for committing one nonhomicide offense, Bunch was sentenced to consecutive, fixed-term sentences—the longest of which was 10 years—for committing multiple nonhomicide offenses.... The Court **did not address juvenile offenders, like Bunch, who received consecutive, fixed-term sentences for committing multiple nonhomicide offenses.**

*Id.* at 551 (emphasis added). The Sixth Circuit observed:

> The Court [in *Graham*] ... did not analyze sentencing laws or actual sentencing practices regarding consecutive, fixed-term sentences for juvenile nonhomicide offenders. This demonstrates that the Court [in *Graham*] did not even consider the constitutionality of such sentences, let alone clearly establish that they can violate the Eighth Amendment's prohibition on cruel and unusual punishments.

*Id.* at 552. *See also Graham*, 560 U.S. at 113 n.11, 130 S.Ct. 2011 (Thomas, J., dissenting) ("[T]he Court counts only those juveniles sentenced to life without parole and excludes from its analysis all juveniles sentenced to lengthy term-of-years sentences[.]"); *id.* at 124, 130 S.Ct. 2011 (Alito, J., dissenting) ("Nothing in the Court's opinion affects the imposition of a sentence to a term of years without the possibility of parole."). If the Supreme Court intended for its holding in *Graham* to apply to consecutive, lengthy sentences, the number of inmates incarcerated for such sentences would likely be in the thousands and certainly exceed the 123 individuals the Supreme Court calculated were serving life in prison without the possibility of parole for committing a nonhomicide offense.[9]

Even putting the Sixth Circuit's analysis in *Bunch* aside for one moment, this

---

48 (2015); *Henry v. State*, 175 So.3d 675, 679 (Fla. 2015); *People v. Reyes*, 407 Ill.Dec. 452, 63 N.E.3d 884, 888 (2016); *Brown v. State*, 10 N.E.3d 1, 6–8 (Ind. 2014); *State v. Null*, 836 N.W.2d 41, 71–74 (Iowa 2013); *State v. Boston*, 363 P.3d 453, 457–58 (Nev. 2015); *Bear Cloud v. State*, 334 P.3d 132, 141–45 (Wyo. 2014).

**9.** The Supreme Court expressly limited its holding in *Graham* to "juvenile offenders sentenced to life without parole solely for a nonhomicide offense," 560 U.S. at 63, 130 S.Ct. 2011, not those juvenile offenders serving consecutive sentences. That express limitation demonstrates, while the Supreme Court found it less difficult to quantify the number of inmates serving life in prison without the possibility of parole solely for committing a nonhomicide offense as a juvenile, it was not called upon nor did it even suggest to rule on the constitutional validity of consecutive sentences amounting to the functional equivalent of life in prison without the possibility of parole.

Court has clear guidance from the Supreme Court that its holding in *Graham* does not apply to Nathan's sentences. As mentioned above, the Supreme Court in *Graham* did not address whether consecutive sentences imposed on a juvenile offender who committed multiple nonhomicide offenses along with a homicide offense, are unconstitutional pursuant to the Eighth Amendment.[10] This is a legally significant distinguishing factor from *Graham* and an additional reason why Nathan's sentences do not run afoul of *Graham*.

The dissenting opinion cites, among other cases, the Supreme Court of Ohio's decision in *State v. Moore*, 149 Ohio St.3d 557, 76 N.E.3d 1127 (2016), in support of its position that Nathan's sentences are unconstitutional pursuant to *Graham*. The dissenting opinion's reliance on *Moore*, however, is misplaced. There, the juvenile offender was sentenced to consecutive, lengthy sentences after being convicted of multiple nonhomicide offenses. *Moore*, 76 N.E.3d at 1129–30, 2016 WL 7448751, at *2. The court in *Moore* held "*Graham*'s categorical prohibition of sentences of life imprisonment without the possibility of parole for juveniles **who commit nonhomicide crimes** applies to juvenile nonhomicide offenders who are sentenced to term-of-years sentences that exceed their life expectancies." *Id.* at 1149, at *22 (emphasis added). The court explained *Graham* applied because the juvenile offender, like the juvenile offender in *Graham*, "was con-

victed of **nonhomicide offenses** that he committed as a juvenile[.]" *Id.* at 1138, at *10 (emphasis added). The court in *Moore* further explained that "*Graham* cannot stand for the proposition that juveniles **who do not commit homicide** must serve longer terms in prison than the vast majority of juveniles **who commit murder**," and that a juvenile offender who "did not commit the ultimate crime of murder" would be serving an unconstitutional sentence pursuant to *Graham*. *Id.* at 1140, at *13 (emphasis added).

*Moore* is distinguishable from this case because Nathan committed not only multiple nonhomicide offenses, but a *homicide offense as well*. See *Graham*, 560 U.S. at 69, 130 S.Ct. 2011 (distinguishing nonhomicide offenses from homicide offenses "in a moral sense" because nonhomicide juvenile offenders "are categorically less deserving of the most serious forms of punishment **than are murderers**") (emphasis added). The dissenting opinion ignores not only this eloquent reasoning from the Supreme Court of Ohio, but also ignores the clearest guidance this Court has from the Supreme Court of the United States that its holding in *Graham* does not apply to the case at bar. See *id.* at 63, 130 S.Ct. 2011 ("The instant case concerns only those juvenile offenders sentenced to life without parole solely for a nonhomicide offense.").[11]

Furthermore, reliance by the dissenting opinion on the Supreme Court of New

---

**10.** To demonstrate just how limited *Graham* is, the Supreme Court found it rather easy to quantify the number of juvenile offenders nationwide serving life in prison without the possibility of parole solely for committing a nonhomicide offense (i.e., 123 total juvenile offenders). The Supreme Court did not quantify the number of juvenile offenders serving consecutive, lengthy sentences for committing multiple nonhomicide offenses, let alone quantify the number of juvenile offenders serving consecutive, lengthy sentences for

committing multiple nonhomicide offenses along with a homicide offense. Certainly, such a task would be quite onerous, and perhaps that is why neither the dissenting opinion nor any court that agrees with the dissenting opinion's result oriented conclusion even attempts to do so.

**11.** Indeed, the dissenting opinion does not even acknowledge this passage in *Graham*.

Jersey's decision in *State v. Zuber*, 227 N.J. 422, 152 A.3d 197 (2017), is misplaced and is not persuasive because unlike Nathan, Zuber was not convicted of a homicide offense along with multiple nonhomicide offenses, *see id.* at 202–03, placing Nathan's sentence outside the contours of *Graham*.

*Graham* is limited to "juvenile offenders sentenced to life without parole **solely for a nonhomicide offense.**" *Id.* at 63, 130 S.Ct. 2011 (emphasis added). Unlike in *Graham*, Nathan was found guilty of second-degree murder along with multiple nonhomicide offenses.[12] Therefore, Nathan's claim under *Graham* is denied.

## *Miller* Claim

Nathan argues the circuit court's imposition of consecutive sentences for a homicide conviction along with several nonhomicide convictions are the functional equivalent of life in prison without the possibility of parole and, thereby, violate the constitutional prohibition on cruel and unusual punishment and his constitutional right to due process under *Miller*.[13] This Court explained in *Hart*, which was handed down contemporaneously with *Nathan I*, that:

> Unlike *Roper*'s unqualified prohibition against sentencing a juvenile offender to

death, *Miller* does not categorically bar sentencing a juvenile offender who commits first-degree murder to life without parole. Instead, *Miller* holds that such a sentence is constitutionally permissible as long as the sentencer determines it is just and appropriate in light of the defendant's age, maturity, and the other factors discussed in *Miller*. This distinction is so critical to a proper understanding and application of *Miller* that it bears additional scrutiny. Rather than attempt to characterize or paraphrase this essential point, however, it is better to let *Miller* speak for itself:

> [T]he Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders. By making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment.... *Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different*, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.

---

12. The dissenting opinion's reliance on the Supreme Court of Louisiana's decision in *Morgan* is unavailing for two reasons. First, that case is distinguishable from this one because the juvenile offender there did not commit multiple nonhomicide offenses along with a homicide offense as Nathan did. *State ex rel. Morgan v. State*, 217 So.3d 266 (La. 2016). Second, the dissenting opinion overlooks a key distinction between two of the court's decisions over the application of *Graham*. The court found *Morgan*:

 > distinguishable from [*State v. Brown*, 118 So. 3d 332 (La. 2013)] and construe[d] the defendant's 99-year sentence as an effective life sentence, illegal under *Graham*. Where-

 as Brown was convicted of five offenses resulting in five consecutive sentences which, when aggregated, resulted in a term pursuant to which he would have no opportunity for release; here, the defendant was convicted of a single offense and sentenced to a single term which affords him no opportunity for release. In declining to extend *Graham* to modify any of Brown's term-of-years sentences, we were most influenced by the fact that his actual duration of imprisonment would be so lengthy only because he had committed five offenses.

 *Id.* at 271–72 (emphasis added).

13. This Court's review of this claim is *de novo. Sisco*, 458 S.W.3d at 312–13.

404 S.W.3d at 237–38 (quoting *Miller*, 132 S.Ct. at 2469). Moreover, *Miller*:

> does not categorically bar a penalty for a class of offenders or type of crime—as, for example, [it] did in *Roper* or *Graham*. Instead, it mandates only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing a particular penalty.

132 S.Ct. at 2471 (emphasis added). Furthermore, the Court in *Miller* concluded that:

> *Graham, Roper,* and [its] individualized sentencing decisions make clear that a judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles. By requiring that all children convicted of homicide receive lifetime incarceration without possibility of parole, regardless of their age and age-related characteristics and the nature of their crimes, the mandatory sentencing schemes before us violate this principle of proportionality, and so the Eighth Amendment's ban on cruel and unusual punishment.

*Id.* at 2475 (emphasis added). *See also id.* at 2460, 2466, 2468–69 (cataloging age-related factors that the sentencer must be allowed to consider before the Eighth Amendment will permit a juvenile offender to be sentenced to life in prison without the possibility of parole); *Hart*, 404 S.W.3d at 234–35 (stating *Miller* "holds only that life without parole may not be imposed unless the sentencer is given an opportunity to consider the individual facts and circumstances that might make such a sentence unjust or disproportionate.") (footnote omitted).

Following the Supreme Court's decision in *Miller*, this Court in *Hart* instructed:

> [I]f the sentencer conducts the individualized assessment required by *Miller* and is persuaded beyond a reasonable doubt that sentencing [a juvenile offender] to life in prison without parole is just and appropriate under all the circumstances, the trial court must impose that sentence. If the sentencer is not persuaded that this sentence is just and appropriate, section 565.020 is void as applied to [the juvenile offender] because it fails to provide a constitutionally permissible punishment [for the crime it purports to create]. In that event, [the juvenile offender] cannot be convicted of first-degree murder and the trial court must find him [or her] guilty of second-degree murder [under section 565.021.1(1)] instead. In addition, the trial court must vacate [his or her] conviction for armed criminal action that was predicated on [the juvenile offender] being guilty of first-degree murder and, instead, find [him or her] guilty of armed criminal action in connection with that second-degree murder....
>
> . . .
>
> After the trial court enters these findings, the sentencer will determine [the juvenile offender's] sentences within the statutory range applicable to these crimes. *See* §§ 558.011.1(1) (range applicable to second-degree murder is 10 to 30 years or life (with parole)) and 571.015.1 (range applicable to armed criminal action is a minimum of three years with no upper limit). [I]f [the juvenile offender] does not waive his [or her] right to jury sentencing on remand, [his or her] sentences for second-degree murder and armed criminal action also will be determined by the jury under section 557.036.3, and the instructions in this regard are the "additional instructions" the jury was told it would be given if it was not persuaded that life without parole is a just and appropriate sentence for [the juvenile offender] un-

der all the circumstances. Conversely, if [the juvenile offender] waives jury sentencing such that the trial court must make the determination required by *Miller*, the trial court will determine [his or her] sentences for second-degree murder and armed criminal action in the event it determines that life without parole is not a just and appropriate sentence for first-degree murder.

404 S.W.3d at 235, 243 (footnotes omitted). This Court provided identical instructions in *Nathan I*:

As set forth in *Hart*, if the sentencer on remand is persuaded beyond a reasonable doubt that sentencing Nathan to life without parole for first-degree murder is **just and appropriate under all the circumstances**, that sentence is constitutional and must be imposed. If the state fails to persuade the sentencer on this point, however, then section 565.020—as applied to Nathan—does not provide a constitutionally permissible punishment. In that event, the trial court must set aside the jury's verdict finding Nathan guilty of first-degree murder and **enter a finding that Nathan is guilty of second-degree murder. Nathan then should be sentenced for second-degree murder within the statutorily authorized range of punishments for that crime.**

404 S.W.3d at 270–71 (emphasis added) (footnotes omitted).

Nathan's sentences do not run afoul of *Miller*.[14] On remand, both the State and Nathan presented evidence for the jury to consider at sentencing. Nathan, in particu-

lar, provided evidence of his mitigating circumstances—such as age-related characteristics, his below-average IQ, and his chaotic and abusive upbringing—as mandated by *Miller*. Because the jury did not unanimously agree to impose life in prison without the possibility of parole for the first-degree murder conviction, which was mandated by § 565.020 before *Miller*, the circuit court vacated the guilty verdict on that charge and entered a finding of guilt for second-degree murder, in accordance with the procedure outlined by this Court in *Nathan I. See id.* As directed by this Court, the circuit court also vacated the armed criminal action conviction in connection with first-degree murder and entered a finding of guilt on armed criminal action in connection with second-degree murder. *See id.* at 271 n.11. The jury then recommended a life sentence for the second-degree murder conviction, a 30-year sentence for the first-degree robbery conviction, a 15-year sentence for kidnapping, and three additional life sentences for the related armed criminal action convictions.

Before imposing the sentences subject to retrial and determining whether the previously imposed sentences not appealed should run consecutively or concurrently, the circuit court considered victim impact statements, Nathan's mitigation evidence (including age-related characteristics, his below-average IQ, and his chaotic and abusive upbringing), and evidence presented at the original trial. The circuit court found, among other things:

- Nathan did not suffer from any mental disease or defect that diminished his criminal responsibility;

14. The dissenting opinion's reliance on the Supreme Court of Indiana's decision in *Brown v. State*, 10 N.E.3d 1 (Ind. 2014), is misplaced. The court did not say Brown's aggregate sentence violated *Miller*. Rather, the court said that "[t]he trial court certainly acted well within its broad discretion in imposing this sentence.... However, '[e]ven where a trial court has not abused its discretion in sentencing, the Indiana Constitution authorizes independent appellate review and revision of a trial court's sentencing decision.' " *Brown*, 10 N.E.3d at 4. The court then held Brown's sentence was "inappropriate" but not unconstitutional. *Id.* at 8.

- The original jury found Nathan acted deliberately in the murder;
- Nathan was armed and threatened to kill one or more victims;
- Nathan attempted to aid another while an officer was being shot;
- Nathan fled the scene and attempted to dispose of evidence; and
- Nathan's overall participation in the crimes was "active," "direct," and "substantial."

■ The circuit court then concluded it was appropriate to impose consecutive sentences on Nathan. The circuit court, therefore, imposed the jury-recommended sentences and ordered they run consecutively to each other and the previously imposed sentences, except the sentences for the armed criminal action counts were ordered to run concurrently to their associated charge.[15]

*Miller* only applies to cases in which a sentencing scheme "mandates life in prison without possibility of parole for juvenile offenders." 132 S.Ct. at 2469. Here, after the jury could not unanimously agree to impose life in prison without the possibility of parole solely for the first-degree murder conviction, the circuit court set aside Nathan's first-degree murder conviction and instead found he was guilty of second-degree murder. Once mandatory life in prison without the possibility of parole was off the table (the "harshest" sentence, so to speak), Nathan was to be sentenced for second-degree murder within the statutorily authorized range of punishments (10 to 30 years or life for second-degree murder). *Miller* has no application to Nathan's second-degree murder conviction, which does not call for mandatory life in prison without the possibility of parole, or to his multitude of nonhomicide convictions because *Miller* did not address the constitutional validity of consecutive sentences, let alone the cumulative effect of such sentences.[16]

Furthermore, reliance by the dissenting opinion on *Zuber* is misplaced and is not persuasive because with respect to Comer, who, like Nathan, was convicted of a homicide offense along with multiple nonhomicide offenses, the Supreme Court of New

---

**15.** Neither the dissenting opinion nor Nathan claim, nor could it be argued, that any one of these particular sentences violates the Eighth Amendment. The circuit court did not impose *more* punishment than what the jury recommended. "[T]he trial court may not impose a greater sentence than the punishment assessed and declared by the jury (provided it was within the authorized range) and, if the jury assesses and declares a punishment below the lawful range, the trial court must impose the minimum lawful sentence." *Hart,* 404 S.W.3d at 234 n.2.

**16.** Even assuming, for the sake of argument, that *Miller* applies to consecutive sentences that amount to the functional equivalent of life in prison without the possibility of parole, the circuit court provided Nathan with the full benefits of *Miller's* individualized sentencing by considering all the mitigating factors set out in *Miller* prior to sentencing him on remand. *See State v. Ramos,* 187 Wash.2d 420, 387 P.3d 650, 666–67 (2017). The dissenting opinion's reliance on *State v. Riley,* 315 Conn. 637, 110 A.3d 1205 (2015), *State v. Null,* 836 N.W.2d 41 (Iowa 2013), *Bear Cloud v. State,* 334 P.3d 132 (Wyo. 2014), *People v. Reyes,* 407 Ill.Dec. 452, 63 N.E.3d 884 (2016), and *McKinley v. Butler,* 809 F.3d 908 (7th Cir. 2016) is unpersuasive because all those cases can be distinguished from this one for the mere fact that the juvenile offenders in those cases were not afforded individualized sentencing that considered the mitigating factors set out in *Miller,* whereas Nathan did receive individualized sentencing because consideration of the *Miller* factors were made by the sentencer prior to sentencing on remand. It is for this same reason that the Supreme Court remanded the cases cited by the dissenting opinion in footnote 1; *Miller* had not been handed down at the time of their sentences so the juvenile offenders in those cases had not received individualized sentencing. The dissenting opinion seems to suggest that even though Nathan received that relief, his sentence should nonetheless be vacated.

Jersey recognized repeatedly that *Miller* applies to a sentencing scheme that *mandates* life in prison without the possibility of parole, 152 A.3d at 210–11, yet it failed to discuss whether its sentencing scheme in fact mandated life in prison without the possibility of parole in violation of *Miller*. And perhaps it was unnecessary for the court to do so because,

> [w]hen Comer was first sentenced in 2004, the trial judge was not required to evaluate the mitigating effects of youth, which *Miller* later addressed. In a detailed written opinion, the same trial judge concluded in 2014 that, because he had not considered the *Miller* factors, Comer was entitled to be resentenced.

*Id.* at 204. The Supreme Court of New Jersey agreed with the trial court's finding, *id.* at 216, and "affirm[ed] and remand[ed] Comer's case" for individualized sentencing pursuant to *Miller. Id.*

The dissenting opinion concedes that its conclusion is not required by *Miller* or *Graham* and that its position—that consecutive sentences for multiple crimes in excess of a juvenile offender's life expectancy is the functional equivalent of life in prison without the possibility of parole—is indeed an extension of law.

The dissenting opinion diminishes the state of Missouri's penological justifications for permitting a circuit court to impose consecutive sentences on a juvenile offender who commits multiple violent nonhomicide offenses along with a brutal homicide offense. Nathan did not receive the harshest sentence available. The jury, rather, recommended a life sentence for the murder and also recommended sentences for the other violent crimes Nathan committed within the statutory range for those violent crimes. The Supreme Court has never suggested that multiple sentences for multiple crimes is impermissible. To do so would defy logic. Furthermore, while the Supreme Court has said youth diminishes the penological justifications for penalties such as capital punishment, *Roper v. Simmons*, 543 U.S. 551, 571, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), life in prison without the possibility of parole solely for a nonhomicide offense, *Graham*, 560 U.S. at 71, 130 S.Ct. 2011, and *mandatory* life-in-prison-without-the-possibility-of-parole sentencing schemes, *Miller*, 132 S.Ct. at 2466, it has never applied that rationale to a justice system that recognizes multiple violent crimes deserve multiple punishments. Therefore, Missouri is permitted to enforce its current sentencing scheme and this Court is obligated to enforce it until the Supreme Court of the United States extends its Eighth Amendment jurisprudence to prohibit what is currently permitted. *See Graham*, 560 U.S. at 71, 130 S.Ct. 2011 ("Criminal punishment can have different goals, and choosing among them is within a legislature's discretion.").

In this case, the circuit court did consider all of the circumstances (mitigators and aggravators alike) prior to imposing the jury-recommended sentences and ordering most of them to run consecutively to each other. The circuit court ultimately concluded consecutive sentences were appropriate for Nathan after consideration of all relevant factors.[17] Nothing in *Miller* or *Graham* takes away a sentencer's (the circuit court in this case) authority to run sentences consecutively for a homicide offense

---

**17.** The dissenting opinion argues because Nathan was a juvenile, "it is the jury, not the judge, who must decide whether [he] is to die in prison, and it said *no.*" Op. at 900 (Stith, J., dissenting). The record shows the circuit court recognized the jury did not find Nathan deserved life in prison without the possibility of parole for the murder conviction alone, but rather a life sentence plus additional sentences, within the statutory range, for the other violent crimes he committed. The circuit court thoughtfully considered the jury-

along with multiple nonhomicide offenses.[18] That power remains with the circuit court. Section 558.026.1 ("Multiple sentences of imprisonment shall run concurrently **unless the court specifies that they shall run consecutively[.]**") (emphasis added). Therefore, Nathan's claim under *Miller* is denied.[19]

### Conclusion

The circuit court did not err by denying Nathan's *Brady* claim. Moreover, there is

nothing unconstitutional about Nathan's sentences pursuant to *Graham*, *Miller*, this Court's or any of the Supreme Court's current Eighth Amendment jurisprudence. For this Court to hold *Graham* and *Miller* apply to consecutive sentences amounting to the functional equivalent of life in prison without the possibility of parole, it would undoubtedly need to extend both holdings to uncharted waters. *See Moore v. Biter*, 742 F.3d 917, 920 n.3 (9th Cir. 2014) (O'Scannlain, J., dissenting) ("Moreover,

recommended sentences and concluded it was acting within the boundaries of *Graham* and *Miller* by imposing the consecutive sentences. This Court agrees with that conclusion.

18. The dissenting opinion asserts the circuit court imposed consecutive sentences "solely for the purpose of denying Nathan a reasonable opportunity for release." Op. at 899 (Stith, J., dissenting). The dissenting opinion also asserts life in prison without the possibility of parole "was the intent, and the effect, of the sentences" imposed, citing a reference to associate justices Elena Kagan and Anthony Kennedy that the circuit court made during a sentencing hearing for support. *Id.* at 895. In the interest of completeness, here is that exchange:

> **Ms. Rose Whitrock:** [W]hen the United States Supreme Court ruled that the defendant was going to get another—well, I just assumed that he would get another—a retrial. You know, I just—it's been really hard because I just think that he is being treated like the victim instead of all of us. You just don't get second chances. And I really want to forgive you, I do; but I can't. And I want to feel sorry for you, but I don't. I feel sorry for me, and I—but mostly I feel sorry for my grandsons. And your family, you have a good family. And in spite of all the bad things that happened to you, your mom loves you. And she—she loves her kids. That's what I got. Yeah, she—she's not perfect, but mother's [sic] aren't. I don't know what else you can do to this man that hasn't already been done. I'm thinking he's probably going to spend the rest of his life in jail. And I hope, like Isabella said, that you in some way can be a role model. I think I would have appreciated it if in the last trial

> that you would have at least tried to defend yourself or showed some remorse or apologized to all of us. Something. I mean, my boys, my grandsons, they—they don't want him to ever get out of jail. I don't know that we would be safe if he was out of jail. So—you could have left my house. I begged you. You could have had everything in that house, everything, every single thing. I begged you to leave. And you just—you just wouldn't. You just wouldn't. So ... I hope we're not back here again, Your Honor, because I don't think I could do it again. I really want to find some peace and I just have not been able to do that.

> **The Court:** Well, I understand, Miss Whitrock. Perhaps Justice Kennedy and Justice be [sic] Kagan will read your remarks some day.

> **Ms. Rose Whitrock:** I just—I can't—I just can't sit through this again.

Sentencing Proceedings, Tr. at 1078–80 (July 25, 2014). The circuit court's comments could more simply draw the inference that constantly changing the law in this area in making the new rules retroactively apply revictimizes those whose family members have been deliberately murdered by a juvenile offender.

19. The dissenting opinion pretends there is authority for this Court to enter an order in this proceeding awarding Nathan with parole after 25 years based on a March 15, 2016, order granting such relief. The dissenting opinion conspicuously fails to mention that virtually every petitioner and the state of Missouri requested this Court to vacate those orders because it lacked authority to enter those orders and, in fact, every such order entered on March 15, 2016, was subsequently vacated by this Court.

even courts that have applied *Graham* to aggregate term-of-years sentences have recognized they are extending the case beyond its 'clearly established' holding."). This Court declines to do so.[20] The circuit court's judgment is affirmed.

Wilson, Russell and Powell, JJ., concur;

Stith, J., dissents in separate opinion filed;

Draper and Breckenridge, JJ., concur in opinion of Stith, J.

Laura Denvir Stith, Judge, dissenting.

While I concur with the majority's denial of Nathan's claim that his rights under *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), were violated, I respectfully dissent from the majority's rejection of Nathan's Eighth Amendment claim.

For the reasons noted below and in my separate opinion in *Willbanks v. Department of Corrections*, SC95395, 522 S.W.3d 238, slip op., 2017 WL 2952445 (Mo. banc 2017) (Stith, J., dissenting), also issued today, most state supreme courts to face the issue, including most recently the Supreme Court of New Jersey in *State v. Zuber*, 227 N.J. 422, 152 A.3d 197, 212 (2017), and the Supreme Court of Washington in *State v. Ramos*, 187 Wash.2d 420, 387 P.3d 650, 660 (2017), as well as two federal courts of appeals have held the

principles set out in *Graham v. Florida*, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010), and *Miller v. Alabama*, 567 U.S. 460, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012), prohibit the imposition of sentences that aggregate to a term of years that approaches or exceeds the juvenile's life expectancy absent a determination by the jury that the juvenile is irredeemably corrupt. The majority is incorrect in stating these decisions reached their results only by extending *Graham*. While *Graham* itself addressed the situation of a life without possibility of parole (LWOP) sentence for a single nonhomicide offense, *Miller*, relying on principles from *Graham*, remanded cases involving multiple offenses—including nonhomicide offenses—for reconsideration in light of its decision,[1] and, indeed, Graham himself had committed multiple offenses. Subsequent state and federal cases have found *Graham* applies to multiple consecutive sentences that aggregate to the functional equivalent of LWOP, not because these courts have chosen to extend *Graham* beyond what they believe the Supreme Court intended when writing it but because the reasoning in *Graham* requires them to reach this result. This does not require extending existing law but merely applying *Graham* to new facts, something courts do every day. This Court should join the many well-reasoned decisions holding the Supreme Court did not intend to place form—the

---

**20.** Contrary to the dissenting opinion's assertion that "[t]his Court has held that it will apply [§ 558.047, RSMo. Supp. 2016] to all juvenile offenders regardless of whether they were convicted before or after *Montgomery*[,]" Op. at 896 (Stith, J., dissenting), this Court has made no such holding, and the dissenting opinion provides no authority to support such a proposition. Section 558.047 was enacted in response to *Miller*'s prohibition of "a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." 132 S.Ct. at 2469. That statute applies to

juvenile offenders sentenced to life in prison without the possibility of parole and juvenile offenders found guilty of first-degree murder, neither of which concern Nathan. Section 558.047.1(1)-(2).

**1.** *Bear Cloud v. Wyoming*, 568 U.S. 802, 133 S.Ct. 183, 184 L.Ed.2d 5 (2012); *Blackwell v. California*, 568 U.S. 1081, 133 S.Ct. 837, 184 L.Ed.2d 646 (2013); *Guillen v. California*, 567 U.S. 950, 133 S.Ct. 69, 183 L.Ed.2d 708 (2012); *Whiteside v. Arkansas*, 567 U.S. 950, 133 S.Ct. 65, 183 L.Ed.2d 708 (2012).

label of LWOP—over substance. A sentence that results in no meaningful opportunity for release during the juvenile's lifetime is the functional equivalent of LWOP.

*Graham* holds juveniles are categorically different and sentences imposed on them must be considered as a whole, not merely crime-by-crime. It is uncontested that Nathan was not an adult. He was a juvenile at the time of his offenses. The Supreme Court has clearly and repeatedly recognized the special vulnerability and immaturity of juveniles, and has specifically held the penological justifications for imposing lengthy sentences—deterrence, retribution, incapacitation, and rehabilitation—simply do not apply in the same way to juveniles due to their still-developing character and understanding. Because juveniles as a whole are categorically different than adults, the Supreme Court has said the propriety of imposing LWOP on a juvenile must be considered as a categorical issue, based on the youth of the offender rather than on the nature of the particular crimes charged. *Graham, 560 U.S. at 60-62, 75,* 130 S.Ct. 2011; *Miller, 132 S.Ct. at 2465-66, 2475.* While the majority suggests this fails adequately to recognize a judge's sentencing discretion, judges will have the same sentencing discretion they always have had; sentencing discretion never has extended to imposing a cruel and unusual sentence. Under *Graham,* sentencing judges simply must take the added step of ensuring a juvenile who is not irreparably corrupt has a meaningful opportunity for release. There is no exception to this categorical approach when sentencing a juvenile for multiple crimes.

To the extent the majority suggests otherwise, and reasons as if courts can ignore the essential distinction mandated by the Supreme Court between sentences that are constitutional if imposed on adults and sentences that are *not* constitutional if im-

posed on juveniles, it is just wrong. The majority nonetheless says if a judge—like the sentencing judge below—simply avoids expressly labeling the sentences "life without possibility of parole," then the judge can reach the same result by aggregating consecutive sentences even though the cumulative effect of these sentences is that the juvenile will not have a meaningful opportunity for release before his or her death. It is a fiction to suggest this is just a collateral result of sentencing the juvenile for multiple crimes. Here, the judge below even made it specifically clear on the record he wanted Nathan to die in prison and, for that reason, he was making the sentences consecutive. In other words, the judge imposed consecutive sentences precisely because he wanted to impose the functional equivalent of LWOP. The Supreme Court has taught us that sentences permissible for adults may not be permissible for juveniles and that we must look at sentences for juveniles as a whole, not crime-by-crime.

Substance, not form, should control. Whether labeled "LWOP," the sentences imposed on Nathan are subject to *Graham* and *Miller* because, like a formal LWOP sentence, de facto life sentences also are the "'denial of hope'" and mean "'that good behavior and character improvement are immaterial ... that whatever the future might hold in store for the mind and spirit of [the convict], he will remain in prison for the rest of his days.'" *Graham, 560 U.S. at 70,* 130 S.Ct. 2011, *quoting, Naovarath v. State, 105 Nev. 525, 779 P.2d 944, 944 (1989).*

Of course, Nathan also committed a homicide. The majority suggests I would hold "a juvenile can never be sentenced to consecutive, lengthy sentences that exceed his life expectancy no matter how many violent crimes he commits." *Nathan, op. at 882.* That is just not the case. Clearly,

under *Miller* and *Graham*, had the jury found Nathan was irreparably corrupt, that would be the end of the Eighth Amendment analysis; he could receive LWOP for his homicide offense, and it would not violate the Eighth Amendment were he to receive multiple consecutive sentences for his nonhomicide offense that exceeded his life expectancy.

But the jury found Nathan was not irreparably corrupt. Once that finding was made, then his position is indistinguishable from that of nonhomicide juvenile offenders for purposes of Eighth Amendment analysis. If a juvenile cannot be given LWOP or its functional equivalent for homicide, he certainly cannot be given LWOP or its functional equivalent for his nonhomicide offenses. Such juveniles fall into the category of all other juvenile offenders who may not be given LWOP for their homicide offense, as their crime is considered attributable in part to "unfortunate yet transient immaturity." *Miller*, 132 S.Ct. at 2469 (internal citations omitted).

Yet, apparently without perceiving the anomaly, the majority nonetheless would hold that the whole is greater than the sum of its parts and that Nathan can be sentenced to the functional equivalent of LWOP on his nonhomicide offenses because of his homicide offense, even though he cannot receive LWOP for his homicide offense or, if *Graham* applies, for his nonhomicide offenses considered separately. There is a perverse irony in holding, as would the majority, that a juvenile offender can be more harshly sentenced for less serious crimes than he can for homicide. As recognized in both *Peters v. State*, 128 So.3d 832, 837 (Fla. App. 2013), and *State ex rel. Morgan v. State*, 217 So.3d 266 (La.

2016), a sentencing scheme that would allow this anomaly is both irrational and contrary to Eighth Amendment principles of proportionality, and to the principles set out in *Graham* and *Miller*. Cf. *Solem v. Helm*, 463 U.S. 277, 291, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983) (concluding when a less serious crime is punished the same as or more harshly than a more serious crime, this indicates the punishment for the less serious crime is likely excessive).

This is why so many state supreme courts to have considered the issue have held it violates *Graham* and *Miller* to impose de facto LWOP sentences on juveniles convicted of both homicide and nonhomicide offenses. This Court should hold likewise and vacate Nathan's sentences.

While the majority has expressed concern that the State cannot know how to determine what length of sentence provides a meaningful opportunity for release, we know it is something short of the juvenile offender's life expectancy. In any event, the legislature already has determined when parole consideration should be offered; this Court merely needs to follow its lead. In response to *Miller*, Missouri's legislature adopted section 558.047, RSMo. 2016, which provides that juvenile offenders sentenced to LWOP may apply for parole after 25 years. This Court has held it will apply this new statute to all juvenile offenders regardless of whether they were convicted before or after *Montgomery v. Louisiana*, —— U.S. ——, 136 S.Ct. 718, 193 L.Ed.2d 599 (2016), as revised (Jan. 27, 2016).[2] This Court can and should apply time limits identical to those set out in section 558.047 to juvenile offenders who are serving de facto LWOP through their aggregate sentences.

2. Section 558.047 provides that juvenile offenders sentenced to LWOP prior to August 28, 2016, and juvenile offenders sentenced after that date to life with parole or a term of 30 to 40 years may petition for a parole hearing after serving 25 years. § 558.047.1, RSMo. 2016.

## I. MILLER AND GRAHAM APPLY TO AGGREGATE SENTENCES THAT INCLUDE A HOMICIDE FOR WHICH LWOP MAY NOT BE IMPOSED

The majority says that to apply the principles from *Miller* and *Graham* to an aggregate sentence would be to enter "uncharted waters." *Nathan, op. at 893.* But this route has been charted and navigated without difficulty by the great majority of state supreme courts to have addressed the question. As discussed below, these courts have held the principles set out in *Miller* and *Graham*, including the requirement that juveniles be granted a meaningful opportunity for release from prison if not irreparably corrupt, apply to all juvenile sentences because the different culpability of juveniles as compared to adults remains no matter the crime committed. The Eighth Amendment, therefore, bars an aggregate sentence that is the functional equivalent of LWOP even when one of the crimes involved was a homicide so long as the homicide is one for which LWOP may not be imposed.[3]

The majority comes to a contrary conclusion because it believes it can simply treat Nathan the same way it would treat an adult defendant and just compare each part of the aggregate sentences he received to each crime. If *Graham* and its progeny had not been decided, the majority's approach would have been the correct one. Prior to *Graham*, if a defendant claimed his or her particular sentence was unduly harsh, and it was not a death penalty case, then "Eighth Amendment analysis focuse[d] on the sentence imposed for each specific crime, not on the cumulative sentence." *United States v. Aiello, 864 F.2d 257, 265 (2d Cir. 1988).*[4]

By contrast, *Graham* explained, in a death penalty case, the Supreme Court traditionally has used what it calls a "categorical approach" under which it determines whether death is categorically unavailable for a particular category of offense, such as a crime not resulting in a death, or for a particular category of offender, such as juveniles or the intel-

---

**3.** *State v. Zuber, 227 N.J. 422, 152 A.3d 197, 210-12 (2017); State v. Ramos, 187 Wash.2d 420, 387 P.3d 650, 660 (2017); People v. Reyes, 407 Ill.Dec. 452, 63 N.E.3d 884, 888 (2016); State v. Riley, 315 Conn. 637, 110 A.3d 1205, 1207 (2015), cert. denied, —— U.S. ——, 136 S.Ct. 1361, 194 L.Ed.2d 376 (2016); Brown v. State, 10 N.E.3d 1, 8 (Ind. 2014); Bear Cloud v. State, 334 P.3d 132, 142 (Wyo. 2014); State v. Null, 836 N.W.2d 41, 45 (Iowa 2013); Commonwealth v. Brown, 466 Mass. 676, 1 N.E.3d 259, 270 n.11 (2013).* Additionally, the Seventh Circuit found an aggregate sentence of 100 years violates *Miller. McKinley v. Butler, 809 F.3d 908, 909 (7th Cir. 2016). State v. Brown, 118 So.3d 332, 342 (La. 2013),* is not persuasive or well-reasoned in reaching a contrary result, for it relied in part on the same mistake made by the majority in *Willbanks:* that finding the aggregate sentence is not contrary to clearly established federal law precludes a state court from applying the underlying constitutional principles to aggregate sentences

because the Supreme Court has not yet decided such a case. *Id.; see also State v. Mantich, 295 Neb. 407, 888 N.W.2d 376 (2016)* (refusing to apply *Miller*).

**4.** Under the sentence-by-sentence approach, *Graham* held a court considers "all of the circumstances of the case to determine whether the sentence is unconstitutionally excessive." *Graham, 560 U.S. at 59, 130 S.Ct. 2011.* This is true for adults even when the sentences cumulatively extend to or beyond a defendant's lifetime, what some cases refer to as "discretionary life sentences." *See, e.g., McKinley, 809 F.3d at 911; Riley, 110 A.3d at 1213.* This traditional analysis would begin by "comparing the gravity of the offense and the severity of the sentence." *Graham, 560 U.S. at 60, 130 S.Ct. 2011.* If the punishment seemed grossly disproportional to the particular crime, the court would then compare the sentence to that of others convicted of similar crimes. *Id.*

lectually impaired.[5] *Graham, 560 U.S. at 61-62, 130 S.Ct. 2011.* In cases that fall under such categories, the death sentence is unconstitutional. The trial court does not have discretion to impose an unconstitutional sentence. *See Hurst v. Florida,* —— *U.S.* ——, *136 S.Ct. 616, 624, 193 L.Ed.2d 504 (2016).*

### A. The Categorical Approach Must Be Used for All Juveniles

*Graham,* for the first time, applied the categorical approach to all juveniles and held the usual sentence-by-sentence approach is inadequate when the challenge:

> implicates a particular type of sentence as it applies to *an entire class of offenders who have committed a range of crimes.* As a result, a threshold comparison between the severity of the penalty and the gravity of the crime does not advance the analysis. Here, in addressing the question presented, the appropriate analysis is the one used in cases that involved the categorical approach, specifically *Atkins, Roper*, and *Kennedy.*

*Graham, 560 U.S. at 61-62, 130 S.Ct. 2011* (emphasis added).

*Miller* took this same approach when addressing the constitutional validity of LWOP for juveniles found guilty of a homicide offense. While the Supreme Court in *Miller* did rule it is permissible to sentence juveniles to LWOP, it limited that ruling to cases in which the court finds the juvenile is one of the " 'rare juvenile offender[s] whose crime reflects irreparable corruption.' " *Miller 132 S.Ct. at 2469, quoting, Roper, 543 U.S. at 573, 125 S.Ct. 1183; Graham, 560 U.S. at 73, 130 S.Ct. 2011.* All other juvenile offenders

are categorically barred from receiving LWOP because their crimes may be attributable to "unfortunate yet transient immaturity." *Miller, 132 S.Ct. at 2469* (internal citations omitted). In other words, any sentence imposed on those who are immature rather than irreparably corrupt must provide the juvenile with a meaningful opportunity for release. *Id.*

The majority does not deny this law but rather argues it is inapplicable here because Nathan committed more than one crime at the same time, and when that is the case, all bets are off, and the juvenile may be sentenced without regard to his immaturity and youth, as if he were an adult. To adhere to the majority's approach is to ignore the Supreme Court's categorical rules regarding sentencing juveniles to life in prison and leads to the anomalous result that a juvenile may be imprisoned longer for nonhomicide crimes than for homicide.

The majority's approach also ignores the reality that the sentencing judge was fully cognizant of and intended the aggregate effect of Nathan's sentences. The judge's comments at sentencing, in his memorandum and order, and at resentencing demonstrate he did not intend for Nathan ever to have a meaningful opportunity for release even though the jury determined he was not one of the rare irreparably corrupt juvenile offenders who deserve LWOP.

In the order issued upon resentencing after remand by this Court pursuant to *Miller,* the judge was forced to sentence Nathan to second-degree murder and life with parole because the jury had failed to find Nathan was irreparably corrupt. Na-

---

5. *See, e.g., Kennedy v. Louisiana, 554 U.S. 407, 413, 128 S.Ct. 2641, 171 L.Ed.2d 525 (2008), as modified (Oct. 1, 2008), opinion modified on denial of reh'g, 554 U.S. 945, 129 S.Ct. 1, 171 L.Ed.2d 932 (2008)* (nonhomicide cases do not merit death penalty); *Roper v. Simmons, 543 U.S. 551, 559-67, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005)* (juveniles cannot be sentenced to death); *Atkins v. Virginia, 536 U.S. 304, 321, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002)* (mentally impaired cannot be sentenced to death).

than, therefore, was entitled to have a meaningful opportunity for release on the murder charge. But the judge again imposed consecutive sentences on the nonhomicide charges, which, in aggregate, do not allow for parole for more than 300 years.

The judge made it clear in imposing these lengthy consecutive sentences that his specific purpose was to circumvent the restrictions on LWOP set out in *Miller* and instead see that Nathan never had a meaningful opportunity for release. His reason was he thought the reliance in these cases on the "evolving standards of decency" approach "lack[s] . . . any anchor in the text of the Constitution or any other objective source." He further stated what he called the "loss on the Eighth Amendment" caused by *Miller* and *Graham* did not preclude him from imposing the sentences consecutively "even if the sum total of those sentences would result in the functional equivalent of life without parole."

The judge made no pretense about the fact he felt a personal stake in being able to sentence juveniles to life without parole and took *Miller* and *Graham* as personal "losses." But he was telling Nathan he could get around his "losses" by imposing multiple distinct sentences for the purpose of their aggregate effect in keeping Nathan in prison forever. The judge further emphasized he was trying to send a message to the authors of *Roper* and *Miller* with his sentences when he said (in response to a victim's statement that she

hoped she would not have to go through another resentencing), "Perhaps Justice Kennedy and Justice Kagan will read your remarks someday." Perhaps they will, but only because the consecutive sentences were imposed consecutively solely for the purpose of denying Nathan a meaningful opportunity for release.[6]

At least two courts have expressly disapproved the type of lengthy aggregate sentences for juveniles imposed here precisely because it is simply an end run around *Graham* and *Miller*. The Louisiana Supreme Court found it a "paradox" that a juvenile offender who could not constitutionally be sentenced to LWOP for more serious felonies could be sentenced to the functional equivalent of LWOP for lesser crimes. *Morgan*, 217 So.3d at 274. It resolved the paradox "in favor of common sense and morality," holding the Supreme Court's categorical rules apply even to sentences not labeled "life" if they are its functional equivalent. *Id.*[7]

*Peters v. State*, 128 So.3d 832, 852 (Fla. Dist. Ct. App. 2013), further explained this anomaly, noting a sentencing procedure that allows for de facto life sentences in cases in which *Graham*'s categorical rule prohibits LWOP leads to a "statutory anomaly" in which a juvenile convicted of a "life felony" may not be given more than a 40-year sentence, but a juvenile convicted of lesser felonies may be sentenced, effectively, to a longer term. The court observed, under that scheme, "Peters would

---

6. The majority says, considered in context, this was not the judge's intent and, instead, he was trying to respond to the victim's concern about having to go through sentencing yet again. The best way to avoid resentencing is, of course, to impose a legitimate and constitutional sentence in the first instance, something the trial judge chose not to do.

7. Oddly, the majority criticizes this dissent for citing *Morgan* as it involved a single 99-year

sentence, not aggregate sentences. *Morgan* is not being cited for the issue of aggregate sentences, however, but for the point it is paradoxical to provide for a functional life sentence for a nonhomicide offense when that length of sentence could not be imposed for a homicide offense, a holding *Morgan* clearly makes and the reasoning of which is directly applicable.

have been better situated had he committed a life felony, a more serious crime under the legislative framework, than the crimes he committed." *Id. at 855.* Applying Eighth Amendment jurisprudence, the court concluded, "This is an affront to the Constitution that cannot stand." *Id.*

The majority spends substantial effort showing *State v. Hart, 404 S.W.3d 232, 235 n.2 (Mo. banc 2013)*, contemplated the juvenile would be sentenced on each additional crime on remand, and the resentencing here was individualized in accord with that approach and did not exceed the jury's recommendation for each individual crime. Again, for the many reasons already discussed above, that misses the point.

Each individual sentence, when considered alone, may be just fine and consistent with the jury's recommendation. And, when sentencing adults, judges have the authority to determine whether each sentence will be served consecutively or concurrently. But the majority overlooks the critical fact that Nathan is a juvenile and the result of the individualized sentencing Nathan received was that the jury found he *was not irreparably corrupt* and therefore did not merit LWOP. As this is not in accord with its desired outcome, the majority relies on the *judge's* individualized determination that Nathan deserved to die in prison, not that of the jury.

Because the defendant was a juvenile, it is the jury, not the judge, who must decide whether Nathan is to die in prison, and it said *no.* The trial judge, and the majority, err in substituting their judgment on irredeemability for that of the jury. The jury

found Nathan was not irretrievably lost, and, therefore, the trial judge was required to consider the aggregate effect of the sentences if imposed consecutively. Because the aggregate effect of these sentences would not give this not-irreparably-corrupt juvenile a meaningful opportunity for release, the judge violated *Graham* by imposing the sentences consecutively.

This Court should reject the majority's anomalous approach and follow the many state supreme courts to have held *Graham* and *Miller* apply to aggregate sentences regardless of whether one of the crimes committed is a homicide.

### B. Miller's Companion Case Itself Involved a Defendant Convicted of Both a Homicide and Nonhomicide Crime

*Miller* itself appears to have rejected the majority's position, for the defendant in the consolidated case, *Jackson v. Hobbs*, similar to Nathan, was convicted of capital felony murder and aggravated robbery in a single robbery-gone-wrong incident. *Jackson v. Hobbs, 2012 WL 94588, \*7-8 (U.S. Jan. 9, 2012) (Joint Appendix)*. Like Nathan, Jackson was convicted even though he did not fire the gun. *Id. at \*8.* The trial judge decided to "merge" the two convictions for sentencing purposes because there was no need for separate sentencing on the robbery charge, given the automatic LWOP, so in effect "there's only one sentence." *Id. at \*54.* This "merged" sentence of LWOP imposed for both convictions was what the Supreme Court found unconstitutional. *Miller, 132 S.Ct. at 2475.*[8]

---

**8.** Although *Graham* was a nonhomicide case, in *Graham* the defendant was convicted of multiple crimes involving a robbery attempted with other juveniles. *Graham, 560 U.S. at 53*, 130 S.Ct. 2011. Graham pled guilty to charges of armed burglary with assault or battery and attempted armed robbery. *Id. at 54*, 130 S.Ct. 2011. Following a probation

revocation, he was sentenced to life for the armed burglary and 15 years for the attempted armed robbery. *Id. at 55-57, 130 S.Ct. 2011.* The sentence was effectively LWOP because Florida had abolished its parole system. *Id. at 57, 130 S.Ct. 2011.* The Supreme Court vacated the judgment below even though Graham

So too, here, the fact Nathan was convicted of both homicide and nonhomicide offenses does not make *Graham* and *Miller* any less applicable. Like Jackson, Nathan's conviction arose from a single robbery incident involving another juvenile. And like Jackson, Nathan did not himself fire the gun that led to the homicide. Because the jury did not find Nathan was irreparably corrupt, he is entitled to have a meaningful opportunity for release, and this right was violated by the imposition of aggregate sentences intended to keep Nathan in prison for the remainder of his life.

## II. THIS COURT SHOULD JOIN THE VAST MAJORITY OF COURTS IN HOLDING MILLER *APPLIES TO AGGREGATE SENTENCES THAT ARE DE FACTO LWOP SENTENCES*

### A. Most State Supreme Courts Apply Miller *in Cases Such as Nathan's*

At least eight state supreme courts and the Seventh Circuit have taken the categorical approach in *Graham* and *Miller* and found the principles set out in those cases bar the imposition of aggregate sentences that cumulatively are so long they are the functional equivalent of LWOP, even where one of the crimes for which the defendant was sentenced was a homicide, unless the *Miller* requirements are satisfied. Such sentences impermissibly fail to take into consideration the special immaturity and special nature of a juvenile offender. No matter how bad the crime, unless the juvenile offender is found to be irreparably corrupt there is always hope for rehabilitation, and the juvenile offender must have a meaningful opportunity for release. Where a term-of-years sentence is so long as to deny the juvenile such an opportunity for release, these cases hold the sentence violates the Eighth Amend-

ment. The reasoning of these cases is so consistent, so persuasive, and so dispositive of the result here that these cases are discussed in turn.

The Connecticut Supreme Court took up the issue in *State v. Riley, 315 Conn. 637, 110 A.3d 1205, 1206-08 (Conn. 2015), cert. denied, — U.S. —, 136 S.Ct. 1361, 194 L.Ed.2d 376 (2016)*, a case involving a juvenile convicted of murder, attempted murder, first-degree assault, and conspiracy to commit murder, and sentenced to a total of 100 years without consideration of age as a mitigating factor. The court held this violated *Miller* and ordered re-sentencing. *Id. at 1218-19*. "It is undisputed that this sentence is the functional equivalent to life without the possibility of parole." *Id. at 1207*. In Connecticut's penal code, a "life sentence" is defined as either LWOP or a definite term of 60 years or more. *Id. at 1207 n.2*. While *Miller* specifically addressed mandatory LWOP sentences, Connecticut found "This [aggregate] penalty is no less harsh if imposed pursuant to an exercise of discretion." *Id. at 1214*. It found the sentence invalid.

The New Jersey Supreme Court is one of the most recent to weigh in, holding juveniles who committed a homicide offense as well as other offenses cannot receive consecutive sentences that are the functional equivalent of LWOP when not irreparably corrupt. That court found "the force and logic of *Miller*'s concerns apply broadly: to cases in which a defendant commits multiple offenses during a single criminal episode," including when "a defendant commits multiple offenses on different occasions; and to homicide and nonhomicide cases." *Zuber, 152 A.3d at 212*.

*Zuber* noted the rationale behind *Roper, Graham, Miller,* and *Montgomery* depends not on whether a sentence is labeled

was convicted of multiple crimes. *Id. at 82,*

130 S.Ct. 2011.

LWOP but on the characteristics of juveniles and the effect of those characteristics on penological goals. *Id. at 207-11.* It found that to be guided by whether a sentence was labeled LWOP incorrectly elevated form over substance, stating:

> Defendants who serve lengthy term-of-years sentences that amount to life without parole should be no worse off than defendants whose sentences carry that formal designation. The label alone cannot control; we decline to elevate form over substance.

*Id. at 212.* Rather, *Zuber* said the relevant question is the practical effect of the aggregate sentences imposed:

> Will a juvenile be imprisoned for life, or will he have a chance at release? It does not matter to the juvenile whether he faces formal "life without parole" or multiple term-of-years sentences that, in all likelihood, will keep him in jail for the rest of his life. We believe it does not matter for purposes of the Federal or State Constitution either.

*Id. at 211.* For the same reasons, *Zuber* held that *Graham* and *Miller* apply to sentences that include punishment for a homicide offense because the focus is not principally on the offense alone but on the characteristics of the offender, because "youth matters under the Constitution" any time there is a "lengthy sentence that is the practical equivalent of [LWOP]." *Id. at 212. Zuber* concluded that the state law governing consecutive sentences for adult multi-episode crimes were insufficient for juvenile offenders. *Id. at 213-14.* The court remanded both cases for resentencing in light of these constitutional principles. *Id. at 215-16.*

The majority suggests *Zuber* is distinguishable because Zuber was not convicted of "a homicide offense along with multiple nonhomicide offenses." *Nathan, op. at 888.* But as the majority later notes, *Zuber* involved both Zuber and the consolidated case of defendant Comer, who indeed was convicted of a homicide offense along with multiple nonhomicide crimes. *Nathan, op. at 891–92; Zuber, 152 A.3d at 203-04.*[9] The New Jersey Supreme Court made very clear that the principles of *Graham*—which are at the heart of *Miller*—apply even when one of the convictions is homicide because the focus is on the characteristics of the offender. *Zuber, 152 A.3d at 212.* Similarly, the majority's attempt to distinguish *Zuber* on the basis the trial court in *Zuber* had not yet had an opportunity to consider and apply the *Miller* factors ignores the point, repeatedly made in this dissent, that yes, here the jury did have an opportunity to consider the *Miller* factors on remand *and determined they were not met.* Had the jury found otherwise, then *Miller* would not bar a sentence of life without parole. Because the jury found Nathan did not qualify as irredeemably corrupt, the trial court was barred from reaching its contrary finding. *Zuber* fully supports this result.

Iowa's approach also is instructive. The Iowa Supreme Court released a trio of opinions applying *Graham* and *Miller* to sentences deemed the functional equivalent of LWOP: *State v. Pearson, 836 N.W.2d 88 (Iowa 2013), State v. Ragland, 836 N.W.2d 107 (Iowa 2013),* and *State v. Null, 836 N.W.2d 41 (Iowa 2013). Null,* like the instant case, involved both homicide and nonhomicide offenses. Null, who was 16 years old at the time of the crimes,

---

**9.** The facts of Comer's crimes are remarkably familiar: Comer participated in a series of burglaries one night, acting with other juveniles. *Id. at 203.* When one of the burglaries went wrong, one of Comer's accomplices shot and killed a victim, making Comer guilty of felony murder. *Id.*

pleaded guilty to second-degree murder and first-degree robbery in exchange for dismissal of a first-degree murder charge. *Null, 836 N.W.2d at 45*. His aggregate 75-year sentence would require him to serve 52.5 years before being eligible for parole, at which time he would be more than 69 years old. *Id.*

While recognizing *Miller* did not specifically address term-of-years sentences that were not labeled "life," *id. at 67*, the court found the principles of *Miller* applied. It found, although Null's sentence was "not technically a life-without-parole sentence," it was so long that it triggered *Miller* protections. *Id. at 71*. It chose to apply those protections under article I, section 17 of the Iowa Constitution, which is a word-for-word identical analog of the Eighth Amendment, stating "*Miller's* principles are fully applicable to a lengthy term-of-years sentence as was imposed in this case because an offender sentenced to a lengthy term-of-years sentence should not be worse off than an offender sentenced to life in prison without parole who has the benefit of an individualized hearing under *Miller.*" *Id. at 72*.

The Indiana Supreme Court used this type of reasoning in reducing an aggregate sentence of 150 years to one of 80 years (which, under the court's reasoning, presumably would allow for release during the defendant's lifetime). *Brown v. State, 10 N.E.3d 1 (Ind. 2014)*. It held *Roper, Graham,* and *Miller* had shown that juveniles are categorically different than adults, and their special characteristics and immaturity must be taken into account in their sentencing. This applied equally to the consecutive sentences at issue in *Brown* as

it did the single LWOP sentences in *Graham* and *Miller,* for "[s]imilar to a life without parole sentence, Brown's 150 year sentence 'forswears altogether the rehabilitative ideal.'" *Brown, 10 N.E.3d at 8, quoting, Graham, 560 U.S. at 74, 130 S.Ct. 2011*. Applying its state constitutional authority to revise sentences, it concluded this categorical approach requires courts to focus "'on the forest—the aggregate sentence—rather than the trees—consecutive or concurrent, number of counts, or length of the sentence on any individual count.'" *Brown, 10 N.E.3d at 8, quoting, Cardwell v. State, 895 N.E.2d 1219, 1224 (Ind. 2008)*. It held an aggregate sentence longer than the prisoner's life violates *Miller* because it "means denial of hope" and that the defendant will remain in prison for the rest of his days. *Brown, 10 N.E.3d at 8*.[10]

Wyoming relied on both Iowa and Indiana in reaching a similar result in *Bear Cloud v. State, 334 P.3d 132 (Wyo. 2014)*. Bear Cloud was convicted of first-degree murder and two burglary related charges, for which he received consecutive sentences of life in prison and two 20- to 25-year sentences. *Id. at 135*. His certiorari petition was pending at the Supreme Court when *Miller* was decided, and the Supreme Court vacated the judgment and remanded the case for resentencing in light of *Miller. Id.* After some confusion as to how to proceed, a hearing was held, and Bear Cloud was resentenced to life with possibility of parole after 25 years on the murder charge, to run consecutive to the two 20- to 25-year undisturbed sentences on the two nonhomicide charges, so he would be eligible for release after 45 years, at age 61. *Id. at 136*.

---

10. The majority is correct that Indiana reached this result in part under its own constitutional authority to revise sentences. But, as discussed above, its reasoning in so doing was based on and fully consistent with

*Graham* and *Miller,* focusing on the differences of juveniles as compared to adults and on the inapplicability of rehabilitative principles to sentences that offer no hope of release.

*Bear Cloud* held these sentences violated *Graham* and *Miller* because the sentences for the nonhomicide offenses had been imposed without considering the factors set out in *Miller*. Sentencing this way was error because "[t]o do otherwise would be to ignore the reality that lengthy aggregate sentences have the effect of mandating that a juvenile 'die in prison even if a judge or jury would have thought that his youth and its attendant characteristics, along with the nature of his crime, made a lesser sentence (for example, life *with* the possibility of parole) more appropriate.'" *Id. at 142, quoting, Miller, 132 S.Ct. at 2460*. The court concluded, "Like the Indiana Supreme Court, we will 'focus on the forest—the aggregate sentence—rather than the trees—consecutive or concurrent, number of counts, or length of the sentence on any individual count.'" *Bear Cloud, 334 P.3d at 142, quoting, Brown, 10 N.E.3d at 8.*

The Wyoming Supreme Court further held that in determining whether the defendant was one of the rare " 'irredeemable' " juveniles " 'deserving of incarceration for the duration of their lives,'" *Bear Cloud, 334 P.3d at 144, quoting, Graham, 560 U.S. at 75, 130 S.Ct. 2011*, the categorical considerations laid out in *Graham* and *Miller* must be applied "to the entire sentencing package, when the sentence is [LWOP], or when aggregate sentences result in the functional equivalent of [LWOP]." *Bear Cloud, 334 P.3d at 144.* Moreover, that analysis would not change depending on whether the aggregate sentence was more than or less than the juvenile offender's actual life expectancy; the issue is whether he will have a meaningful opportunity for release. *Id.*

The Illinois Supreme Court also recently decided a case holding *Graham* and *Miller* apply to an aggregate sentence for homicide and nonhomicide offenses, stating:

In this case, defendant committed offenses in a single course of conduct that subjected him to a legislatively mandated sentence of 97 years, with the earliest opportunity for release after 89 years. Because defendant was 16 years old at the time he committed the offenses, the sentencing scheme mandated that he remain in prison until at least the age of 105. The State concedes, and we agree, that defendant will most certainly not live long enough to ever become eligible for release. Unquestionably, then, under these circumstances, defendant's term-of-years sentence is a mandatory, *de facto* life-without-parole sentence. We therefore vacate defendant's sentence as unconstitutional pursuant to *Miller*.

*People v. Reyes, 407 Ill.Dec. 452, 63 N.E.3d 884 (2016).*

In January of this year, the Washington Supreme Court similarly held "*Miller*'s reasoning clearly shows that it applies to any juvenile homicide offender who might be sentenced to die in prison without a meaningful opportunity to gain early release based on demonstrated rehabilitation." *Ramos, 387 P.3d at 660*. In so holding, *Ramos* rejected "the notion that *Miller* applies only to literal, not de facto, life-without-parole sentences" because "youth matters on a constitutional level." *Id. at 660, 655.*

Holding otherwise would effectively prohibit the sentencing court from considering the specific nature of the crimes and the individual's culpability before sentencing a juvenile homicide offender to die in prison, in direct contradiction to *Miller*. Whether that sentence is for a single crime or an aggregated sentence for multiple crimes, we cannot ignore that the practical result is the same. *Id. at 660.* This is because "the distinctive attributes of youth diminish the penological justifications for imposing the harshest

sentences on juvenile offenders, *even when they commit terrible crimes.*" *Id.*, quoting, *Miller*, 132 S.Ct. at 2465 (emphasis added in *Ramos*). Every juvenile, therefore, is entitled to a *Miller* hearing.[11]

The Massachusetts Supreme Court similarly cited with approval the decisions in *People v. Caballero*, 55 Cal.4th 262, 145 Cal.Rptr.3d 286, 282 P.3d 291 (Cal. 2012), *Ragland*, and *Null* and directed the legislature to be guided by them in determining that a defendant sentenced for first-degree murder and three related weapons charges had to be sentenced to life with parole. While due to the nature of the issues raised the court found it premature to specifically rule on what type of aggregate sentence might be constitutional for the weapons convictions in this homicide case, it said an aggregate sentence that was the functional equivalent of LWOP would violate the Eighth Amendment. *Com. v. Brown,* 466 Mass. 676, 1 N.E.3d 259, 270 n.11 (Mass. 2013).[12]

In *McKinley v. Butler*, 809 F.3d 908 (7th Cir. 2016), the Seventh Circuit held McKinley's two consecutive 50-year sentences, one for first-degree murder and one for armed criminal action, violated *Miller* because he would not be eligible for parole until age 116. *Id.* at 909. In so holding, the Seventh Circuit noted LWOP or its equivalent can be imposed even in a homicide case only if the trial judge or jury considers the *Miller* factors as to both the homicide and nonhomicide charges, which had not occurred there. *Id.* at 914. The same reasoning necessarily applied to the 100-year sentence in that case; it was "a *de facto* life sentence, and so the logic of *Miller* applies." *Id.* at 911.[13]

11. In contrast to Nathan, whom the jury found was not irreparably corrupt, the Washington Supreme Court held, after a *Miller* hearing, Ramos was not barred from receiving a lengthy sentence because he failed to show his crime was due to "a lack of maturity and an underdeveloped sense of responsibility leading to recklessness, impulsivity, and heedless risk-taking." *Ramos*, 387 P.3d at 667. The opinion also notes, even so, Ramos would have a right under a recent Washington statute to seek release after 20 years if he did not commit a crime as an adult and otherwise met the statutory requirements for early release. *Id.* at 659.

12. At the time, the murder statute required mandatory LWOP as the only sentencing option. *Brown*, 1 N.E.3d at 261. Prior to sentencing, however, *Miller* was decided. The trial judge sentenced Brown to life with parole under the second-degree murder statute, a decision of which the Massachusetts Supreme Court approved. *Id.* at 263. In dicta, however, the court made clear it would apply the principles of *Graham* and *Miller* to aggregate sentences that are the functional equivalent of LWOP even in cases involving both homicide and nonhomicide convictions. *Id.* at 270 n.11.

13. *Cf. Moore v. Biter*, 725 F.3d 1184, 1191 (9th Cir. 2013). Although not a homicide case, it is noteworthy that the Ninth Circuit held California's affirmance of Moore's 254-year term-of-year sentence "for multiple crimes was contrary to *Graham* because 'there are no constitutionally significant distinguishable facts' between Graham's and Moore's sentences" because "Moore's sentence determines 'at the outset that [Moore] never will be fit to reenter society.'" *Id.* at 1191, quoting *Graham*, 560 U.S. at 75, 130 S.Ct. 2011. *Moore*, therefore, held, "Under *Graham*, juvenile nonhomicide offenders may not be sentenced to life without parole regardless of the underlying nonhomicide crime." 725 F.3d at 1193; *see also Demirdjian v. Gipson*, 832 F.3d 1060, 1063-64 (9th Cir. 2016), in which the Ninth Circuit grappled with whether a state court's imposition of two consecutive terms of 25 years to life on a juvenile offender convicted of two counts of first-degree murder with intent to torture was the functional equivalent of LWOP. The Ninth Circuit was limited to finding whether the sentence was "'contrary to, or involved an unreasonable application of' clearly established Supreme Court authority." *Demirdjian*, 832 F.3d at 1066, quoting, 28 U.S.C. § 2254(d)(1). In addition, the petitioner would have to prove *Miller*'s principles were clearly established at the time the sentence was affirmed in state court, which occurred six years prior to *Miller*. *Demirdjian*, 832 F.3d

### B. Bunch *is Both Wrongly Decided and Not Applicable to State Courts*

In contrast to this vast array of authority, the majority relies on the Sixth Circuit's opinion in *Bunch v. Smith*, 685 F.3d 546 (6th Cir. 2012). As discussed at length in my dissent in *Willbanks*, *Bunch* does not aid the majority. It did *not* decide that *Graham* and *Miller* do not apply to aggregate sentences. Rather, it held only that *federal* courts are prohibited by *federalism* principles (as set out in *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), and in the Antiterrorism and Expedited Death Penalty Act of 1996, 28 U.S.C. § 2254(d)), from reversing a state court decision unless the state court decision is "contrary to or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States."

*Bunch* concerned a federal habeas petition filed by an Ohio juvenile offender. It reached its result out of deference to what it believed to be Ohio law. It is ironic, then, that in a case involving a codefendant of Bunch, the Ohio Supreme Court recently rejected *Bunch* and found it did not state Ohio law. *State v. Moore*, 2016-Ohio-8288, 149 Ohio St.3d 557, 76 N.E.3d 1127, 2016 WL 7448751 (2016). *Moore* held *Graham*'s rationale requires all juvenile defendants be given an actual meaningful opportunity to obtain release and *Graham* "did not limit that holding to juveniles who were sentenced for only one offense." *Id. at 1142, at \*15*. As the Ohio Supreme Court so eloquently noted, "The number of offenses committed cannot overshadow the fact that it is a child who has committed them." *Id. Moore* concluded there is no consequential distinction between LWOP

and aggregate term-of-years sentences. *Id. at 1137-39, at \*10-11*.

The Ohio Supreme Court's opinion shows it was not bound to follow *Bunch*, and, in fact, it reached the conclusion, despite *Bunch*, that *Graham* does apply to aggregate sentences. As further explained by one of the concurring opinions in *Moore* (and as also explained below), *Bunch* is neither binding nor persuasive as to the application of *Graham* to consecutive sentences. It was based on federalism principles that have no application to state supreme courts, and "[w]e who sit at the pinnacle of a state judiciary should be reluctant to adopt the limited standards of federal habeas jurisdiction as a proper proxy for the rigorous constitutional analysis that claims like Moore's deserve." *Id. at 1155, at \*27* (O'Connor, C.J., concurring).

*Moore*'s analysis was correct. *Danforth v. Minnesota*, 552 U.S. 264, 266, 128 S.Ct. 1029, 169 L.Ed.2d 859 (2008), specifically holds that federalism-based limits such as those relied on in *Bunch* apply only to federal courts. State supreme courts *are not subject* to any of these same restrictions. *See* L. Stith, *A Contrast of State and Federal Court Authority to Grant Habeas Relief*, 38 VAL. U.L.REV. 421, 443, 449 (2004) (discussing the differences between state and federal habeas). As the lengthy discussion above demonstrates, state courts are free to apply established constitutional principles to new facts without waiting for the Supreme Court to direct them to do so in a case on all fours with their own facts.

Even under the federal courts' strict federalism standard, the Seventh and

---

at 1076. Even though the court concluded the petitioner could not discharge these burdens, *id.*, what really distinguishes this case from *Miller* is that the sentence provides for parole eligibility when the inmate would be 66 years

old—a sentence that does not " 'share [any] characteristics with death sentences' " and therefore "does not necessarily trigger *Miller*'s requirements." *Id. at 1077, quoting Miller, 132 S.Ct. at 2466* (alteration in original).

Ninth circuits have held *Graham* is so clearly applicable it is error not to apply its principles to aggregate sentences that are the functional equivalent of LWOP. In *Moore v. Biter*, 725 F.3d 1184, 1191 (9th Cir. 2013), the Ninth Circuit held that California's affirmance of Moore's 254-year term-of-years sentence "for multiple crimes was contrary to *Graham* because there are no constitutionally significant distinguishable facts between Graham's and Moore's sentences." (Quotation omitted). The Ninth Circuit concluded Moore's sentence, therefore, "is materially indistinguishable from a life sentence without parole because Moore will not be eligible for parole within his lifetime. Moore's sentence determines 'at the outset that [Moore] never will be fit to reenter society.'" *Id.*, quoting *Graham*, 560 U.S. at 75, 130 S.Ct. 2011.[14]

Aggregate sentences that are the functional equivalent of LWOP are contrary to *Graham*, the Ninth Circuit held, because in *Graham* "the Supreme Court chose a categorical approach, i.e., a flat-out rule that '*gives all juvenile nonhomicide offenders* a chance to demonstrate maturity and reform.'" *Moore*, 725 F.3d at 1193, quoting, *Graham*, 560 U.S. at 79, 130 S.Ct. 2011 (emphasis added in *Moore*). *Moore*, therefore, held, "Under *Graham*, juvenile nonhomicide offenders may not be sentenced to life without parole regardless of the underlying nonhomicide crime." *Moore*, 725 F.3d at 1193.

And lest it be suggested the Ninth Circuit's decision is an outlier, the Seventh Circuit reached a similar result in *McKinley v. Butler*, 809 F.3d 908 (7th Cir. 2016). The Seventh Circuit held McKinley's two consecutive 50-year sentences, one for first-degree murder and one for armed criminal action, violated *Miller* because he would not be eligible for parole until age 116. *Id.* at 909. In so holding, the Seventh Circuit noted LWOP or its equivalent can be imposed even in a homicide case only if the trial judge or jury considers the *Miller* factors as to both the homicide and nonhomicide charges, which had not occurred there. *Id.* at 914. The same reasoning necessarily applied to the 100-year sentence in that case; it was "a *de facto* life sentence, and so the logic of *Miller* applies." *Id.* at 911.[15]

Even the Sixth Circuit, which decided *Bunch*, recognized state courts were not acting improperly in applying *Graham* to aggregate sentences, stating in *Starks v. Easterling*, 659 Fed.Appx. 277, 280 (6th Cir. 2016):

> In our view, [*Roper, Graham, Miller,* and *Montgomery*] illustrate the Court's growing unease with draconian sentences imposed upon juveniles, even for serious crimes. As this line of jurisprudence continues to evolve, it may well be that the Court one day holds that fixed

---

14. On remand, Moore was made eligible for parole at age 62. *People v. Moore, No. B260667*, 2015 WL 8212832, at *1 (Cal. Ct. App. Dec. 8, 2015). The appellate court found his appeal of the new sentence moot due to a statute granting offenders sentenced to a specific term of years for crimes committed prior to age 23 the right to parole eligibility after 15 years of incarceration. *People v. Moore, No. B260667*, 2017 WL 347460, at *3 (Cal. Ct. App. Jan. 24, 2017).

15. While *Miller* did not involve multiple consecutive sentences, the Seventh Circuit concluded, "A straw in the wind is that the Supreme Court vacated, for further consideration in light of *Miller*, three decisions upholding as an exercise of sentencing discretion juveniles' sentences to life in prison with no possibility of parole...." *McKinley*, 809 F.3d at 914. In other words, the Supreme Court had itself indicated by these remands that multiple aggregate sentences needed to be reconsidered in light of *Graham*.

term sentences for juvenile offenders that are the functional equivalent of life without parole are unconstitutional, especially if the sentencing court has not taken the defendant's youth into consideration. That said, it is not our role to predict future outcomes.

### C. Penological Goals of Retribution, Deterrence, Incapacitation, and Rehabilitation Are Not Served by Aggregate Sentences That Are De Facto LWOP

The majority continues to use a sentence-by-sentence approach, perhaps because like the majority in *Willbanks*, also handed down this date, it believes it would not serve the deterrent and retributive purpose of the criminal law to impose the same punishment for a single crime as for multiple crimes. It is wrong.

First, *Graham* does not bar the imposition of aggregate sentences for multiple crimes; it simply bars making them of such length that the juvenile is given the functional equivalent of LWOP. Second, the juvenile is not required to be released at the time the juvenile is first eligible for parole; the juvenile simply must be considered for parole at that time and the nature of the crimes is then a relevant consideration. Of course, that consideration must be genuine. If the juvenile offender is determined to be irreparably corrupt, then he or she may not be granted parole. The Supreme Court requires, however, that other juvenile offenders be given "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Graham, 560 U.S. at 75*, 130 S.Ct. 2011.

The opportunity is required because characteristics of juveniles mean they are less morally culpable and the normal legitimate penological goals of punishment—retribution, deterrence, incapacitation, and rehabilitation—do not justify the harshest of sentences in the case of juveniles.

*Moore, 76 N.E.3d at 1134–36, 2016 WL 7448751, at *7-8; Null, 836 N.W.2d at 63.* Their reduced culpability, the Supreme Court has said, stems from "three significant gaps between juveniles and adults:"

First, children have a " 'lack of maturity and an underdeveloped sense of responsibility,' " leading to recklessness, impulsivity, and heedless risk-taking. *Roper, 543 U.S., at 569*, 125 S.Ct. 1183. Second, children "are more vulnerable ... to negative influences and outside pressures," including from their family and peers; they have limited "contro[l] over their own environment" and lack the ability to extricate themselves from horrific, crime-producing settings. *Ibid.* And third, a child's character is not as "well formed" as an adult's; his traits are "less fixed" and his actions less likely to be "evidence of irretrievabl[e] deprav[ity]." *Id.*, at 570, 125 S.Ct. 1183.

*Miller, 132 S.Ct. at 2464* (alterations in original).

This reduced moral culpability means retribution is not properly served by the imposition of the harshest sentences: "Because the heart of the retribution rationale relates to an offender's blameworthiness, the case for retribution is not as strong with a minor as with an adult." *Moore, 76 N.E.3d at 1135–36, 2016 WL 7448751, at *8, quoting, Graham, 560 U.S. at 70-71, 130 S.Ct. 2011* (internal quotation and alterations omitted). *Moore* also notes that the Supreme Court has found LWOP sentences to be longer and thus harsher when imposed on juveniles: "A 16-year-old and a 75-year-old each sentenced to life without parole receive the same punishment in name only. * * * This reality cannot be ignored." *Moore, 76 N.E.3d at 1136, 2016 WL 7448751, at *9, citing, Graham, 560 U.S. at 70-71, 130 S.Ct. 2011* (alteration in *Moore*).

The characteristics of juveniles also make them less susceptible to deterrence. According to *Roper*, "the same characteristics that render juveniles less culpable than adults suggest as well that juveniles will be less susceptible to deterrence." *Roper, 543 U.S. at 571*, 125 S.Ct. 1183. Owing to their "lack of maturity and underdeveloped sense of responsibility," juveniles are "less likely to take a possible punishment into consideration when making decisions." *Graham, 560 U.S. at 72*, 130 S.Ct. 2011. The Supreme Court considers the likelihood juveniles weigh such consequences of their acts to be "virtually nonexistent." *Roper, 543 U.S. at 572*, 125 S.Ct. 1183.

A juvenile's capacity for change also means the legitimate concern for incapacitation does not justify LWOP. "To justify life without parole on the assumption that the juvenile offender forever will be a danger to society requires the sentencer to make a judgment that the juvenile is incorrigible." *Graham, 560 U.S. at 72*, 130 S.Ct. 2011. Even when the juvenile has committed a homicide, LWOP is only justified in the rare case when it can be determined at the outset that the juvenile offender is irreparably corrupt. *Miller, 132 S.Ct. at 2469* ("That is especially so because of the great difficulty we noted in *Roper* and *Graham* of distinguishing at this early age between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.") (internal quotations omitted).

Similarly, a juvenile's capacity for change is why a sentence of LWOP thwarts the goal of rehabilitation. This is central to *Graham*:

Life in prison without the possibility of parole gives no chance for fulfillment outside prison walls, no chance for reconciliation with society, no hope. Maturi-

ty can lead to that considered reflection which is the foundation for remorse, renewal, and rehabilitation. A young person who knows that he or she has no chance to leave prison before life's end has little incentive to become a responsible individual.

*Graham, 560 U.S. at 79*, 130 S.Ct. 2011. Indeed, the penological goal of rehabilitation "forms the basis of parole systems." *Id. at 73*, 130 S.Ct. 2011.

For all these reasons, this Court should hold the principles and categorical approach set out in *Graham* and *Miller* apply to all juvenile sentences, whether explicitly labeled LWOP or whether de facto LWOP due to the length of the aggregate sentences imposed, and whether the crimes are all nonhomicide crimes or whether they are homicide and nonhomicide crimes mixed together.

Here, the jury did not find Nathan was irreparably corrupt, and, therefore, he could not receive LWOP for his homicide offense. He also could not receive LWOP for his nonhomicide offenses, and for the reasons I set out at length above and in my dissenting opinion in *Willbanks*, neither could he receive consecutive sentences that aggregate to the functional equivalent of LWOP. It makes no sense that, simply because he was tried for the homicide and nonhomicide crimes together, he can be given such lengthy and consecutive aggregate sentences that he will serve the rest of his natural life in prison without a meaningful opportunity for release.

### D. Remedy

There need be no hesitancy to apply *Graham* to aggregate sentence cases. Difficulties in fashioning remedies have never stayed this Court's hand from doing justice. They should not do so here. Whatever age the Supreme Court had in mind, it is

clear its outer limit was some time before the juvenile offender's death, and here Nathan received a sentence that is far beyond his life expectancy. Under any standard, it is too long where, as here, the juvenile has not been found to be irredeemably corrupt. In any event, this Court does not need to set a specific age by which Nathan or any other juvenile offender must have a parole hearing or specify the hearing must be held within a certain time period before the end of the inmate's life expectancy. As other state supreme courts have noted, the legislature is free to make a legislative determination of how much is too much, by setting a particular point at which parole consideration must be made available.[16]

This reasoning applies equally to Missouri. In 2016, the Missouri legislature adopted what is now codified at section 558.047. That statute was adopted by the legislature in response to *Graham, Miller,* and this Court's decisions holding the legislature cannot sentence a juvenile homicide defendant to LWOP. *See Hart, 404 S.W.3d 232; see Order (Mo. banc Mar. 15, 2016)* (granting juveniles unconstitutionally sentenced to LWOP as per *Miller* and *Montgomery* the possibility of parole after 25 years).

Contrary to the implication of the majority, this Court has never suggested it had no authority to revise the sentences of those affected by *Miller,* as it had voted unanimously to do in light of *Montgomery.* The language of the Court's order vacating their resentencing so they could instead be made subject to the just-passed alternative sentencing mechanism adopted by the legislature in what is now section 558.047, suggests otherwise. In any event, there is no question this Court has exercised its authority to make that statute applicable to all LWOP juvenile offenders, and that statutory definition of the point at which an LWOP juvenile offender must be given a meaningful opportunity for release is the governing law.

Similarly, section 558.047 provides an appropriate mechanism for determining when a juvenile offender is entitled to be considered for release. It provides that juvenile offenders sentenced to LWOP prior to August 28, 2016, and juvenile offenders sentenced after that date to life with parole or a term of 30 to 40 years may petition for a parole hearing after serving 25 years. *§ 558.047.1.* It further provides the parole hearing must consider factors evidencing rehabilitation since being incarcerated as well as the *Miller* factors associated with the youth of the offender at the time of the offense. *§ 558.047.5, incorporating by reference § 565.033.* This statute provides a legislative definition of when a sentence becomes equivalent to LWOP and entitles the juvenile offender to a meaningful opportunity to be considered for release on parole.

Just as in other states, and just as this Court did for the 81 habeas petitioners who asked this Court to apply *Miller* to their sentences, this time standard should

---

16. *People v. Caballero, 55 Cal.4th 262, 145 Cal.Rptr.3d 286, 282 P.3d 291, 296 n.5 (Cal. 2012)* (calling on the legislature "to enact legislation establishing a parole eligibility mechanism that provides a defendant serving a de facto life sentence without possibility of parole for nonhomicide crimes that he or she committed as a juvenile with the opportunity to obtain release on a showing of rehabilitation and maturity"); *Brown, 1 N.E.3d at 270 n.11* (leaving to the legislature to establish "the specific contours" of constitutional juvenile sentencing and admonishing it to take into account the functional effect of sentences including aggregate sentences); *State ex rel. Morgan v. State, 217 So.3d 266, 275-76 (La. 2016)* (holding the court must defer to the legislative intent in its *"Miller* fix" statute to punish "intent to kill" armed robbery as a nonhomicide crime and providing parole eligibility after 30 years).

apply here in the absence of a specific statutory rule or specific contrary direction from the Supreme Court. To be clear, this remedy is offered not to suggest this Court should hold the statute applies directly but rather because the statute sets out what the legislature has defined as a meaningful opportunity for release.

This is the approach taken by this Court in a very similar situation in *Johnson v. State, 102 S.W.3d 535 (Mo. banc 2003)*. After Johnson had committed his crime, Missouri adopted section 565.030, RSMo. Supp. 2013, which provides that persons meeting the definition of "mental retardation" (since amended to substitute the term "intellectual disability") shall receive a life sentence rather than the death penalty for murders committed after August 28, 2001. Not long thereafter, the Supreme Court held in *Atkins v. Virginia, 536 U.S. 304, 321, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002)*, it constitutes cruel and unusual punishment to impose the death penalty on a person who is "mentally retarded." *See also Johnson, 102 S.W.3d at 538*. Although this Court recognized section 565.030.6 did not directly apply to Johnson's pre-2001 homicide offense, it held:

> Nonetheless, in light of *Atkins,* this Court holds as a bright-line test that a defendant that can prove mental retardation by a preponderance of the evidence, as set out in section 565.030.6, shall not be subject to the death penalty.

*Id. at 540.*

This Court should treat section 558.047 the same way. While section 558.047 directly applies to LWOP cases, its constitutional foundation in *Graham*'s principles means it should be used as a bright line rule to be applied as well to sentences that are the functional equivalent of LWOP.

## III. CONCLUSION

On resentencing, the jury found Nathan was not one of the rare irreparably corrupt juvenile offenders who can constitutionally be sentenced to LWOP. The consecutive imposition of sentences requiring 300 years in prison without the possibility of parole has the same aggregate effect as LWOP. This longer-than-life-expectancy sentence violates the principles of *Graham* and *Miller* and violates Nathan's Eighth Amendment right to be free from cruel and unusual punishment, for it denies him any meaningful opportunity for release on his nonhomicide crimes simply because they were imposed at the same time as a non-LWOP sentence was imposed for a homicide crime. I, therefore, would reverse Nathan's conviction and remand for resentencing that provides a meaningful opportunity for release and pursuant to the legislature's 2016 adoption of section 558.047.